# BUTTERFIELD v. CONSOLIDATED FUEL CO.

No. 2413.    April 29, 1913  (132 Pac. 559).

1. BROKERS—COMMISSIONERS—PERFORMANCE OF CONTRACT.  To recover a broker's commission for procuring a purchaser for bonds, the broker must show that his efforts were the procuring cause of the sale of the bonds upon the terms imposed by his contract with the owner.  (Page 502.)

2. EVIDENCE—STATE OF MIND.  In an action for a broker's commission for procuring the sale of bonds, evidence was admissible by the person who finally purchased them that nothing that the plaintiff did induced him to make the purchase, but that he was induced thereto by other causes.  (Page 506.)

3. BROKERS—ACTIONS FOR COMMISSIONERS—PROOF.  A broker cannot recover commission for procuring the sale of bonds, unless he makes out a *prima facie* showing of compliance with the conditions of his contract with the owner.[1]  (Page 507.)

4. BROKERS—ACTION FOR COMMISSIONS—SUFFICIENCY OF EVIDENCE.  Evidence in a broker's action for commissions *held* not to show that plaintiff was the procuring cause of the sale.  (Page 507.)

5. PRINCIPAL AND AGENT—RATIFICATION OF AGENCY—RIGHT.  An agency created for the purpose of selling property upon a commission to be paid in case of sale is not coupled with an interest, so that it may be terminated in good faith at any time without the agent's consent.  (Page 508.)

6. BROKERS—SALE BY OWNER—RIGHT.  After terminating a broker's authority to sell bonds on commissions, the owner could himself sell to one with whom such broker had negotiated without results before termination of his authority, and would not be liable to the broker for commissions.  (Page 508.)

APPEAL from District Court, Third District; *Hon. Geo. G. Armstrong,* Judge.

Action by Frank L. Butterfield against the Consolidated Fuel Company.

Judgment for defendant.  Plaintiff appeals.

[1] Little v. Gorman, 39 Utah, 63, 114 Pac. 321, 327.

AFFIRMED.

*Gustin, Gillette* and *Brayton* for appellants.

*A. R. Barnes* and *E. V. Higgins* for respondent.

### APPELLANT'S POINTS.

Where a principal dealing through a broker goes behind the broker procured by him, revokes the agent's authority and deals directly with the customer, the rule of law is clear that the payment of a commission to the broker upon the sale thus effected cannot be evaded. In order for a principal to sell to such purchaser with impunity, it must appear affirmatively that the action was in good faith; that the negotiations and effects of the broker had been fairly terminated, and that the negotiations between the principal and the purchaser were wholly new negotiations and not merely a prolongation or resumption of those instituted by the broker. (19 Cyc. 426; 8 Cen. Dig. "Brokers" Art. 85, 86, 87 and 98; (Note) 44 L. R. A. 612. Bottom of Col. 2 and cases cited.)

### RESPONDENT'S POINTS.

After having failed to interest Mr. Caldwell's bank in the matter, and after having been advised by Mr. Caldwell that his bank would not be interested in the bond issue, the plaintiff abandoned all negotiations, and he is not now entitled to a commission merely because of the fact that a sale was finally consummated between the defendant company and Mr. Caldwell's bank. (*Wylie v. Marine Nat. Bank,* 61 N. Y. 415; *Markus v. Kenneally,* 43 N. Y. Supp. 1056; *Buscher v. Larkins,* 32 N. Y. Supp. 305; *Fairchild v. Cunningham,* 84 Minn. 521, 88 N. W. 15; *Lipe v. Ludwick,* 14 Ill. App. 372; *Moore v. Creasap,* 109 Iowa, 749, 80 N. W. 399; *Childs v. Ptomey,* 17 Mont. 503, 43 Pac. 714; *McGuire v. Carlson,* 61 Ill. App. 298; *Newgeld v. Orem,* 60 Ill. App. 350; *Smith v. Bradley,* 18 Colo. App. 191, 70 Pac. 696;

*Ayres v. Thomas,* 116 Cal. 144, 47 Pac. 1013; *Studer v. Byson,* 92 Minn. 388; *Quimby v. Tedford,* 4 Colo. App. 210, 35 Pac. 276; *Kesterson v. Chenovort,* 70 S. W. 1091; *Earp v. Cummins,* 54 Pa. St. 394; *Sibbald v. Bethlehem Iron Co.,* 83 N. Y. 378.)

FRICK, J.

The appellant, plaintiff below, brought this action to recover a broker's commission. In this complaint, after stating the corporate capacity of respondent, he in substance alleged that on or about the 16th day of March, 1911, he entered into a contract with the respondent wherein he "agreed to find for said defendant (respondent) a purchaser for certain first mortgage" bonds, and for which services respondent agreed to pay him out of the proceeds derived from the sale of the bonds 2½ per cent. of the par value thereof; that said appellant found a purchaser for said bonds, and as a result of the services rendered by him respondent, in July, 1911, sold "$400,000 worth of said bonds to said purchaser;" that said respondent received the money from the sale of said bonds; that for the services rendered as aforesaid respondent is indebted to appellant in the sum of $10,-000, no part of which has been paid. Respondent answered the complaint by filing a general denial thereto. Upon these issues a trial to the court was had, which resulted in a judgment dismissing the complaint upon respondent's motion for a nonsuit. Appellant has brought the case to this court on appeal and asks us to reverse the judgment upon various grounds; the principal one being that the court erred in sustaining the motion for a nonsuit and in entering judgment dismissing the appellant's complaint.

Although the alleged contract is denied in the answer, yet the evidence leaves no doubt that a contract, in substance as alleged in the complaint, was entered into between the parties. Nor is there any doubt that appellant introduced the officers of respondent to the person who subsequently purchased at least a portion of the bonds, and that some negotiations were entered into by said officers with such person for the

sale of the bonds before appellant's authority was revoked as hereafter stated, and that respondent subsequently sold the bonds to the purchaser before referred to. The question to be determined under the undisputed facts is whether or not appellant's authority had been revoked, and that in consequence thereof he had abandoned all efforts to sell the bonds in question before respondent again took up the matter with the purchaser and thereafter sold them, and that for that reason appellant did not find a purchaser able, ready, and willing to purchase the bonds, and therefore his efforts were not the efficient or procuring cause of the sale thereof. In view of what has been said, it is only the phase relating to the revocation of appellant's authority that we have to deal with now.

We remark further that there are no charges of bad faith, concealment, or fraud on the part of respondent in this case.

In order to recover a commission appellant was required to prove that he had produced a purchaser for the bonds; that is, that his efforts were the procuring cause which resulted in the sale of the bonds for the price and upon the terms and conditions imposed in the contract under which he claims. The duty assumed by a broker under a general contract, as in this case, to find a purchaser, and which he must fulfill in order to be entitled to his commission, is variously stated by the courts. In *Sibbald v. Bethlehem Iron Co.,* 83 N. Y. at page 382, 38 Am. Rep. 441, Mr. Justice Finch, in speaking for the New York Court of Appeals, after discussing the question somewhat at length, lays down the rule upon the subject in the following words:

"But in all the cases, under all and varying forms of expression, the fundamental and correct doctrine is that the duty assumed by the broker is to bring the minds of the buyer and seller to an agreement for a sale and the price and terms on which it is to be made, and until that is done his right to commissions does not accrue."

That case is very frequently cited by other courts in discussing the question.

The foregoing statement of the rule is approved by the Supreme Ccourt of California, in *Zeimer v. Antisell,* 75 Cal. 512, 17 Pac. 642, and in *Ayres v. Thomas,* 116 Cal. 144, 47 Pac. 1013.

In *Wylie v. Marine National Bank* 61 N. Y. 416, the rule is stated thus:

"Before the broker can be said to have earned his commissions, he must produce a purchaser who is ready and willing to enter into contract upon his employer's terms. . . . The broker must be the efficient agent or the procuring cause of the sale. The means employed by him and his efforts must result in a sale. He must find the purchaser, and the sale must proceed from his efforts acting as broker."

The question therefore is: Has appellant brought himself within the foregoing rule? Upon this question the undisputed evidence is to the effect that after the officers of respondent had from time to time furnished appellant various statements and letters recommending the property, maps, and other data, for the purpose of showing that the property upon which a trust deed was made to secure the payment of the bonds in question was first-class security, the appellant had utterly failed for a period of several months to secure a purchaser for the bonds. In view of the prevailing conditions as aforesaid, the president of the respondent corporation, on the 27th day of May, 1911, wrote appellant as follows:

"In the matter of disposing of the bonds of the Consolidated Fuel Company, I have been advised by Mr. W. H. Shearman in person and by letters written by you to him that you are unable to dispose of the issue. Therefore, we take this opportunity of canceling our arrangement with you for the sale of said bonds and respectfully request that you return to us the data, maps, etc., supplied for your aid."

In answer to the foregoing letter, appellant, on June 1, 1911 replied as follows:

"In answer to your letter of May 27th will say some time ago I received a wire from Mr. Harry A. Lee from New York City requesting me to forward to him all data of the Consolidated Fuel Company in my possession. As it was through Mr. Lee and Mr. W. H. Shearman the matter came to me on receipt of Mr. Lee's wire I sent all the data to him. On receipt of your letter I immediately notified Mr. Lee that you had requested return of all data."

Before writing the foregoing letter, appellant had written to Mr. Lee, who he said was assisting him in his efforts to sell the bonds, as follows:

"I sent you all the papers of the Con. Fuel Co. by American Express on 21st. Nothing could be done here. Money has tightened up here in the last few weeks. The other coal company (Vulcan, I think is the name) the one that owns part of the railroad, got in the Chicago market and their paper was offered to every bank in Chicago. They have not done any business and their operations and proceedings hurt our proposition. I will write Mr. Sweet to-day that I have sent all papers and maps to you."

Some time prior to the foregoing correspondence, appellant had submitted all the information and data in his possession to a Mr. Caldwell, who was the authorized agent of the purchaser, and who was authorized to pass on the question of whether the bonds were desirable or not. After Mr. Caldwell had examined into the matter, he returned all the papers and data to appellant and informed him that his company would not be interested in or purchase the bonds. The whole matter was thus supposed to be closed, and no doubt would have been so considered even by appellant had it not been for the fact that Mr. L. H. Curtis, a director of the respondent corporation, happened to be in Chicago, and apparently without knowing (this is, however, not material) the precise status of affairs, called at the office of appellant, and, not finding him at his office left the following note for him, to wit:

"Mr. L. H. Curtis, interested in the Consolidated Fuel Co., Salt Lake City, called. Am now leaving the city for two

or three days. Would be glad to have an interview with you on my return. L. H. C."

Appellant says that he found the foregoing note the latter part of April 1911, and when Mr. Curtis returned to Chicago appellant went with him to the office of Mr. Caldwell. Mr. Curtis did not know to whom he was being taken until they arrived at the office of Mr. Caldwell, when he informed appellant that he had met Mr. Caldwell before and was acqainted with him. The subect of the sale of the bonds was again introduced by Mr. Curtis to Mr. Caldwell in presence of appellant, but Mr. Caldwell again informed both Mr. Curtis and appellant that "we would not be interested in the bonds;" that is, that his company would not buy them. Mr. Caldwell, in the course of the conversation, however, said that he intended to make a trip to the Pacific Coast, and if he did he would stop off at Salt Lake City to see Mr. Clark, the president of the Merchants' Bank, with which he (Caldwell) had some business relations. Mr. Curtis then tried to induce Mr. Caldwell to go West via the Denver & Rio Grande Railway and stop off at Price, Utah, to inspect the property which was to be mortgaged to secure the bonds in question. Mr. Caldwell said he could not do so, and did not go West that way, but he did stop off at Salt Lake City later, and Mr. Clark and the officers of the respondent corporation again took up the bond question with him. It was finally agreed between Mr. Caldwell and said officers that if respondent would pay for the services of an expert to be selected by Mr. Caldwell who should make a thorough inspection and examination of the property that was to be mortgaged to secure the payment of the bonds, and that if such expert's report should be favorable, Mr. Caldwell would then determine whether his company would purchase the bonds or not. The expert was appointed, and after an examination of the property made a very favorable report with respect thereto. After the expert's report was made, Mr. Caldwell agreed to purchase $400,000 worth of the $600,000 bond issue that was intended to be sold originally when the contract was entered into between appellant and respondent, provided respondent

would issue new bonds and execute a new trust deed in which Caldwell's company was made the trustee. New bonds and a new trust deed were issued and executed and $400,000 worth of the bonds instead of $600,000 worth as originally designed were then sold to Caldwell's company some time in August or September, 1911. In addition to the foregoing, appellant very frankly testified that, after he went and saw Mr. Caldwell with Mr. Curtis, he did nothing whatever, that is, that he ceased all efforts to sell the bonds, and that he did not know that they had been sold until he inquired of Mr. Caldwell and he told him that his company had bought $400,000 worth of them. Mr. Caldwell, who was a witness for appellant, also testified that when he refused to purchase the bonds he considered the matter finally closed so far as he and his company were concerned; that in coming West he did not come with the view of purchasing the bonds, but came on other business; that nothing that appellant had done or said induced him to finally purchase the bonds, but it was what Mr. Clark had said and done in the matter that induced him to take up the bond matter again and to purchase them after the report of the expert was made and new bonds and a new trust deed were executed as before stated.

Mr. Caldwell's testimony relating to his state of mind with regard to the purchase of the bonds was objected to by appellant, and its admission is assigned as error. The evidence was competent. In *McGuire v. Carlson,* 61 Ill. App. 295, the law in the headnote is stated as follows:

"In determining the question as to which one of two brokers effected a sale, it is proper to show by the purchaser what was the state of his mind regarding the purchase of the property after he left the broker claiming the commissions."

This seems reasonable. Why may not a purchaser, after testifying to the facts, also state whether at a particular time he had concluded not to purchase and that he considered the matter closed so far as he was concerned? Such a statement is, of course, not conclusive of the question, but it is competent as evidence.

Recurring now to the main proposition. We have already pointed out that appellant in his complaint does not rely upon any fraud, concealment, or improper conduct on the part of respondent. In view of this he must rely upon his contract as pleaded, and unless he has made at least a *prima facie* case upon the question that he had complied with the conditions imposed upon him by the contract he must fail. (*Little v. Gorman,* 39 Utah, 63, 114 Pac. 321-327.)

Is the evidence sufficient to have authorized a finding that appellant has complied with the terms and conditions of the contract alleged in his complaint and under which he was employed to find a purchaser of the bonds in question? We think not. Appellant's whole claim is based, as it must be, upon the fact that after his authority had been revoked by the president of the respondent a right to negotiate further for the sale of the bonds was again given him by what was said and done by Mr. Curtis. Assuming for the moment that what Mr. Curtis said to appellant did authorize him to pursue his efforts further in attempting to sell the bonds, yet Mr. Caldwell, the only person appellant and Curtis went to see, then and there declined to further consider the purchase of the bonds and emphatically so informed both Mr. Curtis and the appellant. The matter therefore was again closed, and pursuant thereto appellant never did, nor offered to do, anything with regard to the sale of the bonds. The only thing, therefore, that gives him even a shadow of a claim to a commission, is that the bonds were finally sold to Mr. Caldwell, the very person to whom appellant had submitted the data and to whom he took Mr. Curtis after appellant's authority had been revoked and after he had returned all the papers and data to Mr. Lee as hereinbefore stated. We remark that the reason why the papers, maps, etc., were returned to Mr. Lee by appellant, as he explained, was because he had received them from Mr. Lee in the first instance. Appellant must therefore recover, if he is permitted to recover at all, upon the sole ground that $400,000 worth of the bonds were finally sold to Mr.

Caldwell. Under the undisputed facts and the law applicable thereto, appellant cannot succeed upon this ground.

Under the contract in question respondent had the legal right to terminate appellant's authority at any time, provided it was done in good faith and not for the purpose of preventing him from consummating pending negotiations to deprive him of his commission.

An agency created for the purpose of selling real or personal property upon a commission to be paid in case of sale as compensation for the services rendered is not one coupled with an interest, and may therefore be terminated at any time without the consent of the agent. (Mechem on Agency, sec. 207.)

There is no claim of bad faith with respect to the revocation of appellant's authority. Nor can it be doubted that appellant's authority was revoked by the president's letter aforesaid, and that he acquiesced in such revocation. After such revocation respondent's officers certainly had the right to do all things which to them seemed proper and necessary to dispose of the bonds, and to that end to make any overtures to Mr. Caldwell in order to induce him to change his mind with respect to the purchase of the bonds without being under further obligations to appellant. The law is clearly to that effect. In *Bouscher v. Larkins,* 84 Hun, 289, 32 N. Y. Supp. at page 306, it is said:

"The well-settled rule is, if a broker abandons the trade or relinquishes his efforts, the principal is not precluded from negotiating with any person whom the broker has introduced; the broker is not entitled to commisson."

In *Earp v. Cummins,* 54 Pa. at page 397, 93 Am. Dec. 718, Mr. Justice Woodward, in a case which in principle is like the one at bar, in referring to the question now under consideration, said:

"But if the services of the broker, whatever they be, fail to accomplish a sale, and several months after the proposed purchaser has decided not to buy, he is induced by other persons to reconsider his resolution, and then makes the purchase as a consequence of such secondary or supervening influence, the broker has no right to the commission."

What others may do to induce a sale, it would seem, may likewise be done by the owner of the property without becoming liable for commission. In *Fairchild v. Cunningham,* 84 Minn. at page 524, 88 N. W. at page 16, it is said:

"Where an agent opens negotiations for such a sale, fails to bring the intending purchaser to definite terms, and the negotiations are abandoned, he is not entitled to a commission, even though the owner of the property subsequently sells the same to the person with whom the agent previously negotiated."

In addition to the foregoing cases, we refer to the following, which will be found directly in point upon this question: *Lipe v. Ludewick,* 14 Ill. App. 372; *Moore v. Cresap,* 109 Iowa, 749, 80 N. W. 399; *Markus v. Kenneally,* 19 Misc. Rep. 517, 43 N. Y. Supp. 1056; *McGuire v. Carlson, supra; Hunn v. Ashton,* 121 Iowa, 265, 96 N. W. 745; *Wylie v. Marine Nat. Bank,* 61 N. Y. 416; *Sibbald v. Bethlehem Iron Co., supra.*

From what we have said we do not wish to be understood as holding that the principal pending negotiations for the sale may revoke the agent's authority and may then avail himself of the agent's efforts to consummate a sale, and after having done so escape liability for the agent's commission. What we are now passing on and deciding is that under the undisputed facts of this case and the law applicable thereto appellant has not made out a *prima facie* case against respondent, and hence the district court committed no error in sustaining the motion for a nonsuit and in entering judgment dismissing the action.

There are a few other assignments, but they are not of sufficient importance to require separate consideration, since they could not have had any influence in the determination of the case by the district court.

We have carefully examined all of the cases cited by appellant, and, without pausing to review them, it must suffice to say that in our judgment they have no bearing upon the questions involved and decided here.

The judgment is affirmed, with costs to respondent.

McCARTY, C. J., and STRAUP, J., concur.