## 49006. KINGSTON DEVELOPMENT COMPANY, INC. v. KENERLY et al.

CLARK, Judge.

"Career case" is a term used by lawyers to describe litigation which contains complex claims and lengthy legalities to the extent that extraordinary amounts of time and effort are necessarily required of the advocates in representing their clients. Such appellation applies to the instant situation. Consider merely numbers: there were three plaintiffs, two defendants, one rejected intervenor, and eight attorneys officially listed as representing these six parties. The result is an appellate record of 176 pages with an index thereto of 71 entries and a nine-volume trial transcript totaling 1,668 pages covering testimony of 19 witnesses and more than 70 documentary exhibits. In behalf of their clients the able attorneys have furnished this court with nine excellent briefs. Additionally, in fulfillment of their advocacy of their clients' cause, they have referred us to the record and extensive briefs in another case involving some similarities recently ruled upon by a different division of our court.

Personal prefatory pensive ponderings,[1] such as the foregoing, recognizably play partial part in this court's eventual decision. Yet when an opinion is limited in length when compared to such a numerical situation, the parties and their advocates who have put so much into their cause may not realize that the participants on the bench have likewise devoted much worry, study, and toil, towards our goal of making certain that our judicial

---

[1] An avid alliteration *aficionado* asserts alphabetical addiction affects all attorneys acting as ardent advocates.

decision represents the correct legal determination.

The instant brouhaha stems from a suit seeking commissions of $210,000 filed by two licensed real estate brokers, Brannan, Marriott & Turner, Inc. ("BM&T") and Daniel B. Kenerly d/b/a Kenerly Realty Co., against Kingston Development Co. ("Kingston"). The claim was based upon an agreement allegedly made by defendant to pay a fee of 10% to plaintiffs by virtue of their having performed their contract to obtain a purchaser for a tract of land in Gwinnett County owned by defendant company. An intervenor plaintiff, Alvin Ashley, and a co-defendant, the Presidential Realty Corporation ("Presidential"), were added by consent. An application for intervention as a plaintiff by Linda Poland, an agent of Kenerly, was denied. Instead of the transaction between Kingston and Presidential being consummated by the usual deed of conveyance from seller to buyer transferring the property which was Kingston's principal asset, the two corporations worked out a stock swap for tax purposes. Thereby all of Kingston's stock was exchanged by Presidential for Presidential's issuance of specified amounts of its restricted stock to the six individuals who constituted Kingston's sole stockholders. The result was that Kingston became a subsidiary of Presidential. There is no contention here that this method was adopted as a device to avoid payment to the brokers of any amounts which might have been owed them nor is there any connotation of wrong-doing therein. In fact, although appellant urges the absence of a legally binding obligation upon the corporation, appellant argues this suit should have been brought against the stockholders as being liable as individuals on a quantum meruit basis. Other facts will be discussed in this opinion where we deal directly with their legal implications.

At the end of a two-weeks trial which by agreement was held before a single judge without a jury, judgment was rendered for $171,250 in behalf of BM&T against Kingston based upon nineteen findings of fact and seven conclusions of law derived therefrom. A motion for new trial and/or modification of said findings, conclusions

and judgment pursuant to Code Ann. § 81A-152 (b) was then filed. After that motion was overruled this appeal followed.

It should be noted that the trial court's judgment also included a decision on the claims of the other litigants inter sese, excepting Linda Poland, but we are not called upon to consider those rulings.

1. The legal principle which is determinative of many of the questions so capably presented by all nine briefs on this appeal was first enunciated in 1853 by Justice (later Chief Justice) Warner[2] in *Wiley, Parish & Co. v. Kelsey,* 13 Ga. 223. Generically referred to as "the any evidence rule," it provides that when a non-jury single-judge judgment is reviewed in the Georgia appellate courts neither the Supreme Court nor the Court of Appeals will interfere with a finding by the trial tribunal "where there is *any* evidence to support it." That phrase, including the italicization of the word "any," comes from *Balkcom v. Vickers,* 220 Ga. 345, 348 (138 SE2d 868). There Justice (now Chief Justice) Grice pointed out that this rule stems historically from the long struggle in our state for the establishment of a Supreme Court, "one of the charges of the opposition being that this court would re-try factual issues." Thus, our appellate courts are limited to "correction of errors of law" as stated in the Georgia Constitution. Justice Grice also noted our "any evidence" requirement differs from

---

[2] Hiram Warner was one of the illustrious triumvirate, the other two being Joseph Henry Lumpkin and Eugenius A. Nisbet, who constituted our Supreme Court when first created on December 24, 1845. His memorial in 68 Ga. 845 reports that during a divided tenure comprising twenty-one years he wrote 1,969 opinions. As Chief Justice he presided over two impeachment trials in the General Assembly. These impeachments took place in 1879 and involved the State Treasurer and Comptroller General. The former was acquitted. The latter was found guilty and removed from office. See Georgia Senate Journal for 1879 Adjourned Session.

the standards used by other judicial systems including the federal reviewing courts where their inquiry is "whether the evidence is 'substantial' or whether the finding is 'clearly erroneous,' or 'manifestly wrong'."

As we pointed out in *Pinkerton & Laws v. Atlantis Realty,* 128 Ga. App. 662, 665 (197 SE2d 749) this "any evidence rule" still applies even though Code Ann. § 81A-152 (a) which was added in 1969 to our Civil Practice Act of 1966 duplicated Rule 52 of the Federal Rules of Civil Procedure and reads, "Findings of fact shall not be set aside unless clearly erroneous. . ." Since the instant appeal is from the Civil Court of Fulton County, we observe that in *Spivey v. Mayson,* 124 Ga. App. 775 (186 SE2d 154) this court ruled that Code Ann. § 81A-152 applies to that trial tribunal.

Concomitant with this principle is the directive that "After judgment every presumption and inference favors it and the evidence must be construed to uphold rather than to destroy it. [Cit.]" *Givens v. Gray,* 126 Ga. App. 309, 310 (190 SE2d 607). Thus, in considering arguments concerning the fact findings we can not disturb the judge's findings and judgment absent some error of law. *First National Bank of Atlanta v. Langford,* 126 Ga. App. 325, 329 (190 SE2d 803).

2. From our review of the transcript and our determination that there is present therein the necessary amount of testimony to satisfy the "any evidence" principle we must rule adversely to appellant on those enumerations of error which contest the trial judge's findings of fact. Accordingly, we hold there is no merit to enumerations Nos. 4, 5, 6, 7, 8, 9, 11, 12, 14 and 15.

3. The tenth enumeration of error attacks the court's legal conclusions dealing with an allegation as to dual agency. Appellant contends the court erred in its ruling "that a dual agency, to be effective in any contract arising therefrom, must have the consent of all the principals," and that "[t]hose principals may avoid the contract at their election if they acted promptly." The twelfth enumeration is similar in urging "The court erred in concluding as a matter of law that the brokers acted promptly to avoid the contract between BM&T and the Kingston shareholders."

The thrust of appellant's argument attacking these legal conclusions is that John Carson who was a vice-president of BM&T and also a stockholder of Kingston negotiated a commission agreement on October 8 between Kingston's six shareholders including himself and BM&T which changed the alleged original agreement between BM&T and Kingston. We find these two enumerations (10 and 12) to be without merit because the legal conclusions resulted from factual findings concerning the nature of the agency, the limitations of the agent's authority, the knowledge of the principals concerning the agent's activities and their reliance thereon. The trial judge's findings of fact as to these were contrary to the appellant's assertions.

4. Assignments of error numbers 15, 16, 17 and 18 attack the trial court's legal conclusions that the stock swap between Presidential and Kingston's stockholders represented fulfillment of the agreement by the broker with Kingston as a corporation to find a purchaser for Kingston's Gwinnett County land.

Stripped to its basics the proposition presented can be stated thusly: Can a property owner who contracts with a licensed broker to pay as commissions a stated percentage of the sales price of its land be relieved of that contractual liability for commissions through a change in the form of the transaction from the usual seller's deed of conveyance into an exchange of corporate stock between the parties? We recognize the transaction's legal results are that (1) the corporation (Kingston) still holds legal title to the realty and (2) the corporation is transformed into a subsidiary of the parent company which had sought to purchase the property. Jurisprudential pragmatism prevents the exaltation of legalities to a sacrosanct status in disregard of realities. Courts do in fact recognize the truth implicit in the Coca-Cola slogan "It's the real thing." This practical approach leads us to rule that the contractual commissions commitment continues enforceable against Kingston. Such "real thing" conclusion is confirmed by the fact that Presidential in its annual report to its stockholders regarded the acquisition of the Gwinnett County property as a purchase by Presidential (R. 1240 G, J and

X; R. 1421 I and R).

Philosophically, we see no reason why such reverse piercing of the corporate veil should not be enforced even though no fraud is alleged. In a case factually similar to that at bar the Supreme Judicial Court of Massachusetts ruled for the broker in Morad v. Haddad, 329 Mass. 730, 735 (110 NE2d 364) stating: "The sale of all of the stock of the corporation was in legal effect a sale of all of its assets, and the mere fact that the parties found it more convenient to transfer all of the stock rather than to make a conveyance of its assets does not change the substance of the transaction." Another case of this nature is Benedict v. Dakin, 243 Ill. 384 (90 NE 712) which ruled that a broker who is employed to procure a purchaser of all of the company's property earns his commission when he procures a purchaser for all of the stock of the corporation.

In urging that we should impose the liability, if any, on the stockholders rather than the corporation, appellant makes a persuasive presentation concerning income tax aspects. This court is not called upon here to decide if payment of the judgment would be an unauthorized distribution of assets to stockholders or a deductible corporate expense. We do not deem these tax features to require any deviation from our ruling nor need we point out to knowledgeable counsel that the instant case results from genuinely adversary litigation. See Commissioner v. Estate of Bosch, 387 U. S. 456 (87 SC 1776, 18 LE2d 886).

During the pendency of this appeal an opinion was rendered in *Sims v. Mayflower Apts.,* 130 Ga. App. 695 (204 SE2d 358) in which reference was made to *Allison & Co. v. McMath Plantation Co.,* 29 Ga. App. 414 (115 SE 916). By supplemental briefs appellant urges the rulings in those two cases "are conclusive authority for a reversal of the judgment." We can not accept this thesis because we find both cases to be distinguishable from that sub judice. In the *Allison* case the issues differed from those here. The jury there had to decide questions concerning authority of the corporation president, expiration of the brokerage contract before consummation of the sale, and whether the brokers were the procuring cause. The jury

verdict decided those issues adversely to the broker. With these extraneous issues we can not construe the *Allison* case as being contrary to the instant holding. This is particularly true since it is there stated in Division 1 at page 414 that ". . . Upon the procurement of such purchasers the defendant corporation would have become liable. . ." The court thereby recognized as has been ruled by us that where the corporation contracts with a broker that it is the corporation as contracting party—not its stockholders as individuals—that would be responsible for commissions.

Similarly we can not regard the *Sims* case as holding contrary to the views herein stated because the ratio decidendi was the failure of the broker to show that the contractual condition precedent (the death of the corporation president within the specified time period) had occurred. The discussion in the opinion beginning at page 699 is obiter dicta being prefaced with the phrase, "Assuming arguendo."

In the rendition of the instant opinion adverse to Kingston we had not made any ruling herein contrary to the *Allison* or *Sims* rulings.

5. The next two enumerations of error (19 and 20) present for consideration the question of whether BM&T was entitled to the contract rate of 10 percent rather than quantum meruit. Appellant asserts that the percentage figure was based upon procurement of a buyer ' at the purchase price of three million dollars. Accordingly, appellant argues that "absent a binding contract between BM&T and the Kingston shareholders, BM&T is entitled to a commission equal only to the reasonable value of its services." It is now well established as stated in the trial court's conclusion (R. 152) that "in order for the real estate broker to earn its commission it was not necessary that the terms of the sale be those which were originally proposed and that the broker is entitled to its commission regardless of the fact that the owner, itself, concludes the sale upon a price less than and under terms different from those at which the broker was authorized to sell. *Graves v. Hunnicutt,* 8 Ga. App. 99, 68 SE 558 (1910); *Edwards v. Andrews Brothers,* 24 Ga. App. 645, 101 SE 775 (1919); *Spence v. Walker,* 92

Ga. App. 609 (89 SE 2d 668 (1955)); *Humphries & Jackson v. Smith*, 5 Ga. App. 340 at 342, 63 SE 248 (1908); *Doonan v. Ives & Krouse*, 73 Ga. 295 (1884)." Such principle does not ipso facto require a reduction in the percentage commissions basis. It is true the trial judge here did not make a specific finding of fact to the effect that the contractual arrangement was to pay 10% of the purchase price of the land if sold to the broker's party for less than $3,000,000. It is obvious from his conclusions and the judgment that he recognized the evidence (T. 149, 150, 1104, 1412) showed the engagement to be for a ten percent commission based on the sale price if the transaction was made with the prospect procured by the broker. "Where there is a special contract between the parties, a recovery on quantum meruit cannot be had." *Thomas McDonald & Co. v. Elliott*, 92 Ga. App. 409, 410 (88 SE2d 440).

6. The next enumeration of error deals with disposition in the trial court of a defense which had been added by amendment contending that the commission rate of 10% represented a "violation of the Sherman Anti-Trust Act, 15 U.S.C. § 1 and the Constitution and Public Policies of the State of Georgia." (R. 76). This added defense was stricken on the basis that the Civil Court of Fulton County was "without jurisdiction of such subject matter." (R. 80). This was a pretrial ruling made by a judge other than the jurist who presided at the trial. The presiding judge permitted the defendant to introduce into evidence the contentions raised by this defense. This included the decree of the U. S. District Court in United States of America v. Atlanta Real Estate Board. (T. 1628-1633; Defendant's Exhibit K-36). With this evidence being in the appellate record, the claimed defense comes within the ambit of Code Ann. § 81A-115 (b) as being an issue treated in all respects as if it had been raised in the pleadings. Accordingly, if the original dismissal of this defense was error, it must be considered harmless.

7. The final enumerations of error (22 and 23) deal with the court's order refusing to permit Linda Poland to intervene as a party plaintiff, the contention being that she was an indispensable party. Her petition for intervention shows her claim is made as an agent of

Kenerly Realty Co., one of the original plaintiffs along with BM&T. (R. 117). There was no error in denying the Kingston motion. *Midland National Life Ins. Co. v. Emerson,* 121 Ga. App. 427 (174 SE2d 211).

8. The prior rulings herein dispose of the other enumerations of error (1, 2, 3, and 13).

*Judgment affirmed. Bell, C. J., and Quillian, J., concur.*

ARGUED FEBRUARY 4, 1974 — DECIDED JUNE 18, 1974 — REHEARING DENIED JULY 11, 1974 —

*Kilpatrick, Cody, Rogers, McClatchey & Regenstein, R. Lawrence Ashe, Jr., Frederick S. Middleton, III,* for appellant.

*Troutman, Sanders, Lockerman & Ashmore, John J. Dalton, Hamilton Lokey, Charles M. Lokey,* for appellees.