## A98A0243. LEVERETT et al. v. JASPER COUNTY BOARD OF TAX ASSESSORS.
### (504 SE2d 559)

ELDRIDGE, Judge.

The trial court in this bench trial committed legal error in entering a judgment for the Jasper County Board of Tax Assessors ("Assessors") for two reasons that caused the assessments to lack uniformity: (1) in failing to follow the mandate of OCGA § 48-5-2 (3) (B) (ii) and (iv) "[e]xisting use of [the] property" and "[a]ny other factors

deemed pertinent in arriving at fair market value"; and (2) in failing to exempt from taxation standing timber under the uniformity mandate of OCGA §§ 48-5-7.1 (a) (1) and 48-5-7.5 as set forth in Art. VII, Sec. I, Par. III (e) (2), Ga. Const. of 1983 (Ga. L. 1990, pp. 2437, 2438, § 2), "standing timber shall be assessed only once, and such assessment shall be made following its harvest or sale and on the basis of its fair market value at the time of harvest or sale." These errors resulted from following the erroneous appraisal methods used by the Assessors in which growing, but not yet marketable, timber is treated as adding no value to the land and in which stump land and scrub timberland are treated as having substantially the same value as cleared cultivatable land, pasture land, or growing timberland.

1. The Assessors failed to follow the mandate of OCGA § 48-5-2 (3) (B) (ii) and (iv) when they refused to consider "[e]xisting use of the property" both as to the comparables and as to the subject property. This made their method of arriving at evidence of comparable value an error of law. *Inland Container Corp. v. Paulding County Bd. of Tax Assessors*, 220 Ga. App. 878 (470 SE2d 702) (1996). "Under that statute, the tax assessor must consider, inter alia, the existing use of property and 'any other factors deemed pertinent in arriving at fair market value.' OCGA § 48-5-2 (3) (B) (ii) and (iv)." Id. at 879 (1). Thus, the trial court, in relying upon a valuation conducted in violation of OCGA § 48-5-2 (3) (B) (ii) and (iv), committed a plain legal error in thus ruling for the Assessors and against the taxpayers, Cason and Leverett.

Further, such failure to follow statutory mandate is reviewed by "the customary 'plain error' standard of appellate review." *Harper v. Landers*, 180 Ga. App. 154, 157 (348 SE2d 698) (1986). This is not an analysis under the "any evidence" standard, which deals with errors of law based upon the *factual* predicate. *Hawkins v. Grady County Bd. of Tax Assessors*, 180 Ga. App. 834, 835 (3) (350 SE2d 790) (1986).[1] The recitation of the evidence in the record is only to show

---

[1] " '[T]he any evidence rule[ ]' . . . provides that when a non-jury single-judge judgment is reviewed in the Georgia appellate courts neither the Supreme Court nor the Court of Appeals will interfere with a finding by the trial tribunal 'where there is *any* evidence to support it.' That phrase, including the italicization of the word 'any,' comes from *Balkcom v. Vickers*, 220 Ga. 345, 348 (138 SE2d 868) [(1964)]. There Justice (now [former] Chief Justice) Grice pointed out that this rule stems historically from the long struggle in our state for the establishment of a Supreme Court, 'one of the charges of the opposition being that this court would re-try factual issues.' Thus, our appellate courts are limited to 'correction of errors of law' as stated in the Georgia Constitution. Justice Grice also noted our 'any evidence' requirement differs from the standards used by other judicial systems including the federal reviewing courts where their inquiry is 'whether the evidence is "substantial" or whether the finding is "clearly erroneous," or "manifestly wrong." ' " *Kingston Dev. Co. v. Kenerly*, 132 Ga. App. 346, 348-349 (208 SE2d 118) (1974). See also *Thompson v. Hill*, 143 Ga. App. 272 (238 SE2d 271) (1977). Such "any evidence" rule does not apply to *legal* error review. See *Balkcom v. Vickers*, supra at 348-349.

how the refusal to obey the statutory mandate led the Assessors and the trial court into reversible *legal* error.

(a) The General Assembly in 1991 exempted standing timber, both growing and marketable, from ad valorem taxation until the standing timber is sold unharvested or after harvest, whichever first occurs. See Ga. L. 1991, pp. 1903, 1907, 1919-1924, §§ 2, 6; OCGA §§ 48-5-7 (b); 48-5-7.1 (a) (1); 48-5-7.5 (unamended). Such Act was passed under the uniformity requirement of Art. VII, Sec. I, Par. III (e) (2), Ga. Const. of 1983 that permits only one assessment of standing timber, either on sale or harvest.

This annual tax exemption caused a major problem for Jasper County because $20,000,000 of standing timber, representing 51,000 acres of timberland, suddenly was removed from the county tax digest. The Jasper County Board of Tax Assessors ("Assessors") was in the middle of a reappraisal of the timberland and suddenly had to change the method of their appraisals of timberland. Both appellants' tracts were timberland.

Under the statute, the Assessors could no longer value timber on the land as part of the fair market value of the land for assessment purposes. Therefore, they made the decision to ignore and treat growing timber of less than six inches in diameter under the assumption that it had zero value as nonmerchantable. They assumed that merchantable timber is "[t]imber that you can sell on the market if there's a market for it." They assumed that the minimum size pine tree to qualify as pulpwood would be a tree with a six-inch diameter or greater. They made another assumption that all rural land, i.e., cleared land, stump land, and non-merchantable timberland, was of comparable value except where there is "merchantable timberland." Stump land is land where the trees have been harvested, and the stumps, brush, and debris remain on the land.

However, the Chief Assessor admitted in judicio that cleared land and stump land had a substantial difference in value, because it cost approximately $400 per acre to clear the land, i.e., grub out the stumps, clear the land, and burn the debris. Therefore, stump land versus cleared land, i.e., pasture, agriculture fields, and even cleared and replanted pine land, have a substantially different value based upon cost to improve alone; thus, improved land has a higher acreage fair market value which reflects the cost of clearing and replanting pines or of fencing.

Thus, under the Assessors' methodology, previously harvested timberland that had been replanted and contained replanted standing timber less than six inches in diameter was treated as having no value added to the land price because the timber is non-merchantable in that tax year, although the timber would have value upon maturity. The record contained expert witness testimony which

demonstrated that clearing and replanting pines can cost up to $400 per acre. If the land reassessed had standing timber, then the Assessors sought to determine the stump value of the land under the standing timber without calculating the value of the timber.

The Assessors decided that the way to determine the value of timberland, without determining the value of the standing timber and subtracting such value from the overall value of the timberland, was to determine the value of rural land *alone* without regard to timber. This would save them labor, even though the pre-1992 reappraisal provided the data for such calculations as part of the Assessors' records. Further, in the individual property reappraisals they made no adjustment for timber on the land to prevent taxing the timber. In fact, the Assessors ignored the value of standing timber on the land. However, using such comparable sales, the Assessors also made no adjustment to fair market value for the comparable sales or tracts reassessed for standing timber, i.e., growing or merchantable. On all of the comparable sales the tax records indicate that there was some timber on the land, but the timber was treated as having no value. Therefore, the timber value was reflected in the price of the land, because the value of the timber alone was not removed.

Had the Assessors calculated the value of the growing timber, i.e., seedling to pre-marketable timber, for each comparable tract sold, subtracted out such growing timber value, and then calculated the sales ratio from the remaining values, such method could then be used as a comparable for stump land to determine the fair market value of the land with timber being reassessed without calculating the value of the timber. In short, had the Assessors, in arriving at their 19 comparables for the sales ratio, accounted for the value that growing timber added to the land and subtracted out such value to arrive at the fair market value for the stump land alone, then those 19 calculations of growing timber value subtracted out of the comparables would allow them to have a sales ratio for stump land that would allow them to ignore the standing timber on each reassessment, because the fair market value of the comparables thus determined would reflect only the value of stump land and not have land and growing timber *mixed together* to form the fair market value.

(b) In the initial nineteen large acreage tracts the Assessors had as part of the sales ratio and as having no merchantable timber to form the comparables the following: seventeen had been partially cut over to form stump land or had some scrub timber; eight had significant natural regeneration of pines; eight had well-stocked, natural regeneration of pines; one had pine trees less than twenty feet tall and four inches in diameter; two had pines taller than twenty feet and more than four inches in diameter; and the two Greer tracts, upon belated visual inspection, had merchantable standing timber.

Of the comparables, eleven were sales of less than fifty acres, and only seven were sales of one hundred acres or more. All of the comparables were classified as primarily woodland with no merchantable standing timber, although two were later determined to have significant merchantable timber. While none was classified as being cultivated open land, seven had some pasture land between three and 25.82 acres, with the remaining acreage primarily woodland; however, one one hundred six-acre parcel had sixty-eight acres of pasture. Two had ponds: one was an eight-acre pond, and the other was a one-acre pond.

The flaw in the methodology used by the Assessors in relation to the property described above is that the Assessors ignored the mandate of OCGA § 48-5-2 (3) (B) (ii) and (iv) requiring the consideration of the "[e]xisting use of property" and "[a]ny other factors deemed pertinent in arriving at fair market value," i.e., OCGA § 48-5-7.4 (a) (1) and (2). They ignored the existing use of the comparable sales of woodland, as well as the appellants' timberland, by ascribing no value to the growing trees. They recognized that the value of mature trees influenced the value of the land; however, they refused to recognize that stump land had a different value from pasture with fencing or fields, because of land preparation and clearing costs.

In their tax records, the Assessors already had set up subcategories of woodland with less than merchantable timber for valuation: (1) stump land or scrub woods; (2) significant natural regeneration of pines; (3) well-stocked, natural pine regeneration; (4) planted pines with trees less than six feet in height; (5) planted pines with trees less than twenty feet in height and diameter less than four inches; and (6) planted pines with trees over twenty feet in height and over four inches in diameter. Each such category would have a different per-acre value effect on the fair market value of the land. However, the Assessors did nothing to factor such different values out of the fair market value per acre of each comparable, so that such value of the growing timber would not be part of the assessed value and taxed. Instead, the Assessors engaged in the fiction that such different values for growing timber had no effect on the fair market value of the land used as comparables to obtain the value of land alone. Treating the six categories of woodland and cleared land as having substantially the same values violated uniformity of treatment of Art. VII, Sec. I, Par. III (e) (2), Ga. Const. of 1983, because the values per acre differed between the woodland and the preparation costs of cleared and improved land. While defining merchantable timber as pines with a diameter of less than six inches, they removed the two Greer tracts from the sales ratio study as comparables after the tax reassessments had been made and mailed, because the trees were greater than four inches but less than six inches in diameter and had

a merchantable value. The Assessors determined that the error of inclusion of the Greer tracts, in their opinion, would not distort the sales ratio and invalidate the reassessments already made before their error was discovered, although the tracts did contain marketable timber that was exempt; they had not inspected the Greer tracts and *assumed* that this was stump land, because that was the only land the grantor normally sold.

(c) "Taxation of all kinds of property of the same class must be uniform and by the same standard of valuation, equally with other taxable property of the same class. [Cits.]" *Champion Papers v. Williams*, 221 Ga. 345, 346 (144 SE2d 514) (1965); see Art. VII, Sec. I, Par. III (e) (2), Ga. Const. of 1983. "The [trial] court erred, however, in approving a valuation which tilted market value in favor of an assumed 'highest and best use' to appear from future speculation and development, rather than first determining the criteria for zoning, existing use, and deed restrictions, if any, at which time other pertinent factors may be considered. *Chilivis v. Backus*, 236 Ga. 88 [(222 SE2d 371) (1976)], was written before the Legislature substituted 'fair market value' for 'cash price' in [OCGA § 48-5-2 (3)]; the specific criteria were, however, a part of the statute at that time and the court held that 'highest and best use' is a factor only if it would reflect the amount that would be realized from a cash sale of the property; that valuation will not be confined to actual use alone, and that all criteria added by the General Assembly (see Ga. L. 1975, p. 96) are to be considered." *Dotson v. Henry County Bd. of Tax Assessors*, 155 Ga. App. 557, 559 (271 SE2d 691) (1980); see also *Cobb County Bd. of Tax Assessors v. Sibley*, 244 Ga. 404 (260 SE2d 313) (1979); *Sibley v. Cobb County Bd. of Tax Assessors*, 171 Ga. App. 65 (318 SE2d 643) (1984); *Stoddard v. Bd. of Tax Assessors of Grady County*, 163 Ga. App. 499, 501 (3) (295 SE2d 170) (1982). "Under [OCGA § 48-5-2], the tax assessor must consider, inter alia, the existing use of property and 'any other factors deemed pertinent in arriving at fair market value.' OCGA § 48-5-2 (3) (B) (ii) and (iv)." *Inland Container Corp. v. Paulding County Bd. of Tax Assessors*, supra at 879 (1); see also *Brian Realty Corp. v. DeKalb County*, 229 Ga. App. 185 (493 SE2d 595) (1997). While comparable land sales used to determine fair market value do not have to be identical to the subject property, such sales must be sufficiently similar to the subject property to be fairly said to have some rational and probative comparability other than mere geographic location. See *Hawkins v. Grady County Bd. of Tax Assessors*, supra; see also *Inland Container Corp. v. Paulding County Bd. of Tax Assessors*, supra at 881.

" '[E]xisting use' must be employed as a 'yardstick' with which to measure fair market value." *Inland Container Corp. v. Paulding County Bd. of Tax Assessors*, supra at 879 (1). Accord *Dotson v. Henry*

*County Bd. of Tax Assessors*, supra at 559. The Assessors rejected consideration of "existing use" not only in the sales ratio studies to develop comparables, but also in the assessment of the subject tracts, by ascribing no value to growing timber in different stages of maturity of agricultural/forestry use. The "evidence [demanded] a finding that the assessors 'did not consider use of the property in question or the property of all others similarly situated.' *Ayers v. Douglas County Bd. of Tax Assessors*, 162 Ga. App. 224, 225 (2), 226 (291 SE2d 84) (1982)." *Inland Container Corp. v. Paulding County Bd. of Tax Assessors*, supra at 881.

Further, in this case, the Assessors did not consider present use, either in developing the comparables or in reassessing the tracts, because standing timber or timberland was either removed or treated as non-merchantable, which is to disregard present use for forest agricultural purposes. Thus, the method and the comparables lack uniformity. Art. VII, Sec. I, Par. III (e) (2), Ga. Const. of 1983; *Inland Container Corp. v. Paulding County Bd. of Tax Assessors*, supra at 879-880; *Hawkins v. Grady County Bd. of Tax Assessors*, supra at 835; *Stoddard v. Bd. of Tax Assessors of Grady County*, supra at 501; *Dotson v. Henry County Bd. of Tax Assessors*, supra at 559; *Sibley v. Cobb County Bd. of Tax Assessors*, supra at 69.

Hilton, the Chief Tax Appraiser, when asked why timber sales were not utilized to develop the sales ratio for comparables, testified: "[w]e did not use tracts with substantial timber. Because of the timber market being so volatile where you — where I have seen where tracts of land have sold for, say, $100,000 and they cut the trees and they sale [sic] the timber for $110,000 giving a negative value. It just does not give a true bare dirt price in the market." "[W]e don't have the knowledge to back the timber out." He also testified that "not all pieces of property fit a schedule. It's not a perfect, as you say, world. Therefore other underlying factors must be considered and therefore you could flat value a piece of property based on characteristics, location or neighborhood. . . . Small and large." However, such cannot be done in disregard of the statutory mandates.

There were 7,700 tax parcels in the county, and 1,100 were considered large parcels. Of the 1,100 large parcels, approximately 600 have no improvements on them, i.e., houses, barns, or other structures. However, from the Assessors' own records and appraisal methods used by other tax assessors elsewhere, it is practical and possible for standing timber to be appraised separately from the land. See generally *Hancock County Bd. of Tax Assessors v. Dickens*, 208 Ga. App. 742, 743 (1) (431 SE2d 735) (1993) (1991 tax year when Ga. L. 1990, p. 1901 applied prohibiting separate treatment). See Art. VII, Sec. I, Par. III (e) (2), Ga. Const. of 1983.

2. The Georgia Constitution prohibits standing timber being

assessed more than once and requires such assessment be made after sale or harvest. Art. VII, Sec. I, Par. III (e) (2), Ga. Const. of 1983. The General Assembly deferred ad valorem taxation on growing trees so that growing forestry products were exempt from annual ad valorem taxation until sold or harvested, because the Assessors were taxing annually all stages of timber growth prior to 1992, which caused multiple taxation of the same standing timber at different stages of growth. See Art. VII, Sec. I, Par. III (e) (2), Ga. Const. of 1983; OCGA § 48-5-7.5. This meant that the growing but not yet merchantable timber had value that required deferral and exemption from taxation so that standing timber would not be annually taxed prior to harvest or sale. Deferral prevented multiple taxation of the single forestry product prior to harvest, thereby causing taxation to occur at harvest or sale of the unharvested timber. Art. VII, Sec. I, Par. III (e) (2), Ga. Const. of 1983. To the extent that growing standing timber is reflected in the land value at reassessment of the land and the value for growing timber is not removed from the fair market value, such growing standing timber is being assessed over and over at each annual reassessment in violation of the constitutional prohibition against more than one assessment of standing timber; further, such assessment is being done at a time other than sale or harvest. Art. VII, Sec. I, Par. III, Ga. Const. of 1983.

The General Assembly did not define "standing timber" for purposes of OCGA § 48-5-7.5 as "trees less than six inches in diameter" as did the Assessors, because *all* stages of timber growth were to receive tax deferral. Tax deferral has a rational basis only when timber is considered as an agricultural cash crop that takes considerable time to grow to full maturity, and when it can be harvested, returns cash to pay the deferred taxes. OCGA § 48-5-7.1 (a) (1) provides deferral from ad valorem taxation to bona fide agricultural uses, including "forestry." The statute makes no distinction between "merchantability" and maturing forests. In fact, if trees that had not reached maturity, i.e., "merchantable" within the Assessors' definition, had no economic value, then the General Assembly performed a futile act in deferring taxation on "standing timber"; clearly, the General Assembly intended to exclude from ad valorem taxation all growing forestry products, i.e., pine seedlings to harvestable timber or pulpwood, until either sold or harvested. Thus, growing timber has economic value that must be exempted from annual taxation, even though the growing timber could not be sold. Ga. L. 1991, pp. 1903, 1907, 1919-1924, §§ 2, 6 (OCGA § 48-5-7.5 unamended).

In point of fact, in Jasper County in 1991, there were 51,000 acres of timberland with $20,000,000 worth of growing "standing timber," and there were 1,100 tracts of land larger than 26 acres and 6,600 parcels of less than 26 acres. A substantial portion of the

51,000 acres of timberland, worth $20,000,000, was in the 1,100 large tracts, which included the 17 comparable sales that the Assessors defined as having no "merchantable" timber because the timber was not mature. The Assessors' assumption that growing, but not mature, timber had no value was not supported by the Assessors' own records. Thus, the Assessors, in not subtracting the value of growing timber from the fair market value of the land used in the sales ratio as comparables, refused to treat growing timber as tax-exempt and caused what is exempt from taxation until sold or harvested to be part of the assessed value of the land. See Art. VII, Sec. I, Par. III (e) (2), Ga. Const. of 1983; OCGA §§ 48-5-7.1 (a) (1); 48-5-7.5. Had the Assessors calculated the value of the growing timber for each of the comparables and subtracted out such value of the sales price for each comparable before calculating the sales ratio, so as to reflect only the value of the land alone, then current use for growing trees and tax deferral would have complied with the statutory mandate, and the sales ratio for the comparables would reflect only the value of the underlying land for timberland, excluding the standing timber.

*Judgment reversed. Johnson, P. J., Beasley, Smith, JJ., and Senior Appellate Judge Harold R. Banke concur. Andrews, C. J., and McMurray, P. J., dissent.*

McMurray, Presiding Judge, dissenting.

The superior court denied the appeal of these two appellants after determining that they "failed to prove by a preponderance of the evidence that there was a lack of uniformity or that the values and the methods used were improper or incorrect." On appeal, this Court considers the sufficiency of evidence and not its weight. The evidence presented at trial was sufficient to authorize the judgment of the trial court, which should be affirmed. *Hawkins v. Grady County Bd. of Tax Assessors*, 180 Ga. App. 834, 835 (350 SE2d 790). My view of the evidence supporting the trial court's findings differs from the majority's views, especially concerning the market value of immature timber. Therefore, I respectfully dissent.

The 1994 appraisal of appellants' land was increased over the appraisal for the preceding year because of an increase in a location zone multiplier assigned to the northern portion of the county where the property in question was located. The location zone multiplier for appellants' land was increased from 1.08 to 1.6 resulting in a 48 percent increase in the appraisals. This Court has previously approved of dividing a county into zones so as to realistically include location as a factor of value, so long as the zones are not arbitrarily fixed but drawn from analysis of property sales in the county. *Bethea v. Joint City-County Bd. of Tax Assessors*, 219 Ga. App. 111 (1), 112 (464

SE2d 37); *Thomas County Bd. of Tax Assessors v. Balfour Land Co.*, 214 Ga. App. 181, 182 (446 SE2d 745).

In the case sub judice, the change in the location zone multiplier, accompanied by a reduction in the number of zones into which the county was divided and a consequent redrawing of the zones, was based upon sales ratio studies which appellants maintain were flawed. Appellants maintain that the large tract study (pertaining to tracts of 26 or more acres) was flawed because the tax assessors excluded sales of timberland from the study and also because some of the tracts of land included in the study did contain significant quantities of timber for which no adjustment in sales price was made, resulting in a taxing of timber value prior to harvesting in violation of the uniformity requirement and the provision of the Georgia Constitution that standing timber be assessed only once following harvest. Art. VII, Sec. I, Par. III (e) (2).

As to the exclusion of timberland sales from the study, there is no requirement in Georgia law that comparable sales be identical, so that the valuation of timberland may be properly accomplished without the benefit of timberland sales. *Inland Container Corp. v. Paulding County Bd. of Tax Assessors*, 220 Ga. App. 878, 879 (1), 881 (470 SE2d 702). Therefore, the trial court was authorized to consider evidence that the valuation of the underlying land from timberland sales was not practical due to the volatile nature of timber prices. The conflicting evidence presented by appellants, that timber value could and should be backed out of timberland sales to obtain a realistic value for the underlying land, presented a factual question for resolution by the trial court as trier of fact and which was determined adversely to appellants.

Appellants' contention, that the land sales used in the large tract study contained tracts with timber for which no adjustments in sales prices were made, presents another factual dispute which the trial court resolved against defendants. The original list of sales considered did include two timberland tracts which were later removed from the study without affecting the conclusions of the study. As to the tracts left in the study, the tax assessors testified as to examining each tract and finding no merchantable timber. There was no evidence that growing but not yet merchantable timber might contribute to the value of a tract of land. Therefore, no error was apparent in the failure to adjust the sales prices for such tracts.

Finally, I fail to find any lack of uniformity inherent in the subclassification of the county by tract size, the division here being into large tracts of 26 acres or more, and small tracts of less than 26 acres. Tract size was acknowledged as a consideration in determining fair market value by the experts who testified in this case and has been noted in our prior decisions. See, *Thomas County Bd. of Tax*

*Assessors v. Balfour Land Co.*, 214 Ga. App. 181-182, supra, and *Monroe County Bd. of Tax Assessors v. Remick*, 165 Ga. App. 616, 619 (300 SE2d 203). Furthermore, within each subclassification there were further adjustments for tract size.

In the case sub judice, appellants have attempted to demonstrate a lack of uniformity by showing a divergence in the values assigned to similar properties near the boundary of these two subclassifications. However, once more, the evidence on this point is conflicting and within the domain of the trial court as trier of fact.

I am authorized to state that Chief Judge Andrews joins in this dissent.

DECIDED JULY 16, 1998.

*Jay S. Ricketts*, for appellants.
*W. Dan Roberts*, for appellee.