## A04A0297. EVERETT v. GOODLOE et al.
### (602 SE2d 284)

MIKELL, Judge.

Donna Everett appeals the trial court's grant of summary judgment to her former employer, John D. Goodloe, Jr., and companies previously owned by Goodloe, Abaco Inn Limited and Noble Island Properties Limited ("Noble Island"), on her claims of assault, battery, intentional infliction of emotional distress, invasion of privacy, and for quantum meruit. We affirm.

> On appeal of the grant of summary judgment, this court applies a de novo review of the evidence to determine whether any question of material fact exists. Summary judgment is appropriate where the moving party can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A defendant meets this burden by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. . . . All of the other disputes of fact are rendered immaterial.[1]

The record in this case shows that from 1989 to 2000, Goodloe, a licensed real estate broker, owned a hotel in the Bahamas called the Abaco Inn. The hotel was owned by Abaco Inn Limited, which was a wholly owned subsidiary of Noble Island. Goodloe owned all of the shares of Noble Island. Appellant was employed as Goodloe's part-time personal secretary from January 1998, to October 1999. Prior to becoming Goodloe's employee, Everett dated Goodloe during the summer and fall of 1997. In October 1997, Goodloe ended the relationship and asked Everett not to call him. He asserted that he loved Everett, but, because they shared no intimacy, he could not continue the relationship. Goodloe did request that Everett keep him abreast of the progress of her book, in which he had invested $25,000. On December 3, 1997, Everett e-mailed Goodloe that she was searching for a part-time job, and he hired her as a personal secretary.

---

[1] (Citations and punctuation omitted.) *Howard v. J. H. Harvey Co.*, 239 Ga. App. 677, 678 (521 SE2d 691) (1999).

During Everett's employment with Goodloe, she maintains that she was sexually harassed, both mentally and physically, after refusing Goodloe's sexual advances. Also during that time, Everett maintains that she found a buyer for the Abaco Inn and that Goodloe agreed to pay her a fee for her assistance, which he failed to do in retaliation for her refusal to have a more intimate relationship with him. Everett filed this action, alleging assault, battery, invasion of privacy, and intentional infliction of emotional distress and asserting a claim for quantum meruit. Conversely, appellees contend that this lawsuit arose because Everett was not paid a commission from the sale of Noble Island, and not because Goodloe sexually harassed Everett. Goodloe filed a motion for summary judgment as to each of Everett's claims, which was granted. Everett appeals the grant of Goodloe's motion. The detailed facts pertinent to each of Everett's enumerated errors are discussed seriatim below.

1. Everett argues that the trial court erred by granting summary judgment to Goodloe on her claim for unjust enrichment.

The facts relevant to this enumerated error show that Goodloe began negotiating with prospective purchasers of the Abaco Inn in 1999. Goodloe averred that in October 1999, he reached an agreement with John Head to sell the Abaco Inn and the adjacent lot that was owned by Noble Island.

Everett deposed that six or seven months before Goodloe's contact with Head in October, she told Goodloe that she knew someone, whom she later identified as Head, who was interested in purchasing the hotel; that she had already given Head the "proforma" on the hotel when she told Goodloe about her prospective purchaser; that Goodloe told her that she "would be amply rewarded" if she found a buyer; and that at their initial conversation, she and Goodloe did not discuss the percentage that she would receive as her fee. After Head told her the price was excessive, she told Goodloe that she no longer had a prospective buyer, without ever having identified Head.

After a hurricane damaged the hotel, Goodloe reduced his asking price. Everett deposed that she told him that she wanted to approach her prospective buyer again with the reduced price; that she gave Head the new "proforma" with the reduced price; and that once she knew Head was interested, she told Goodloe about him, and again asked how she would be rewarded. Again, Goodloe told her she would be amply rewarded but would not give her a figure. Everett deposed that she sent a letter to Head, formally introducing him to Goodloe, but that when negotiations began, her involvement in the transaction ceased. Everett did not enter a written agreement with Goodloe regarding her fee, but deposed that she thought her services were worth five to ten percent of the purchase price.

Goodloe admitted that Everett told him that she wanted to be compensated for finding Head and that he planned to give her some form of compensation, though he did not feel she was entitled to it. When asked how he classified the amount he was willing to pay Everett, he called it a bonus. Goodloe specifically stated that he never considered paying Everett a commission, because she was not a licensed real estate agent. Goodloe decided not to pay Everett a bonus after she filed the lawsuit.

In opposition to Goodloe's motion, Everett filed the unnotarized affidavit of John Head.[2] Head averred that he saw Everett at a social gathering and asked about the hotel; that she told him the previous purchasers were not going to close the deal because the hotel had been damaged during a hurricane and that Goodloe would probably reduce his purchase price; that she promised to contact him after she talked to Goodloe about the hotel; that within a few days, on September 23, 1999, he received a letter from Everett via facsimile, along with the letter from Goodloe to the previous prospective buyers and the "proforma"; that the letter provided Goodloe's home telephone number and address and encouraged Head to review the materials quickly; and that Everett met with him personally to review the materials and, in his presence, called Goodloe to arrange a meeting between them.

In October 1999, Goodloe and Head reached an agreement whereby Goodloe would sell Head the Abaco Inn, including the land, hotel buildings, furnishings, equipment, and business, and the adjacent lot that was owned by Noble Island for $2,750,000. They initially planned to structure the deal as a real estate asset purchase but ultimately entered a stock purchase agreement. Goodloe sold Head 100 percent of the stock of Noble Island. The deed to the real property remained unchanged.

(a) Everett argues that she was entitled to recover her fee because as a one-time referral agent, she was not governed by the real estate laws prohibiting unlicensed persons from engaging in acts related to the sale of real estate. It is correct that OCGA § 43-40-29 (a) (9) provides that Chapter 40, which governs the conduct of real estate brokers and salespersons, does not apply to

> [a]ny person acting as a referral agent who is not involved in the actual negotiations, execution of documents, collection of rent, management of property, or other related activity which

---

[2] "[I]n the absence of a valid jurat, a writing in the form of an affidavit has no force, no validity, amounts to nothing, when standing alone, or when construed in connection with other evidence." (Citations and punctuation omitted.) *Allen v. Caldwell*, 221 Ga. App. 54, 55 (1) (470 SE2d 696) (1996).

involves more than the mere referral of one person to another and who: (A) Does not receive a fee for such referral from the party being referred; (B) Does not charge an advance fee; and (C) Does not act as a referral agent in more than three transactions per year.

However, Everett did not raise this argument below. Instead, she argued that a real estate license is not required to collect a fee where a transaction involves a sale of stock, rather than a sale of land. Further, Everett contended that the fee she sought was simply a finder's fee. Everett made no reference in the trial court to her argument on appeal that she was exempt from the real estate statutes because she was a referral agent.

In responding to a motion for summary judgment, plaintiffs must "produce whatever viable theory of recovery they might have or run the risk of an adjudication on the merits of their case."[3]

[O]ur appellate courts are courts for the correction of errors of law committed in the trial court. Routinely, this Court refuses to review issues not raised in the trial court. . . . Fairness to the trial court and to the parties demands that legal issues be asserted in the trial court. If the rule were otherwise, a party opposing a motion for summary judgment need not raise any legal issue, spend the next year thinking up and researching additional issues for the appellate court to address, and require the opposing party to address those issues within the narrow time frame of appellate practice rules.[4]

Therefore, because Everett did not raise this argument below, she cannot raise it now on appeal.

Pursuant to OCGA § 43-40-1 (2) (A), "any person who, for another, and who, for a fee, commission, or any other valuable consideration or with the intent or expectation of receiving the same from another . . . assists in procuring prospects for the . . . sale [of] any real estate" is considered to be a broker, and therefore, is subject to the laws applicable thereto. OCGA § 43-40-30 (a) provides that such a person is deemed a licensee and violates the law by acting without a license. In *Unifund Gen. v. Orr*,[5] an action to recover a real estate broker's fee, this Court held that a corporation that contracted to find

---

[3] *Summer-Minter & Assoc. v. Giordano*, 231 Ga. 601, 606 (203 SE2d 173) (1974).

[4] (Footnotes omitted.) *Pfeiffer v. Ga. Dept. of Transp.*, 275 Ga. 827, 829 (2) (573 SE2d 389) (2002).

[5] 191 Ga. App. 836 (383 SE2d 199) (1989).

a purchaser in exchange for a $150,000 fee was precluded from bringing an action to recover the fee because it was not a licensed real estate broker, despite the fact that the contract specified that none of the parties were acting as a real estate broker.[6] The Court reasoned, "It is not the *name* one gives to a transaction, but the substance, which is material and which must be inspected and analyzed to determine its validity. Regardless of what the transaction is called, it cannot be upheld if it is prohibited by statute."[7] Similarly here, Everett's attempt to recover a fee for procuring a buyer for Goodloe is likewise prohibited because she is not a licensed real estate broker.

(b) Everett argues, in the alternative, that the real estate code, as a whole, does not apply to this transaction because it involved a sale of stock, not real estate. A fortiori, she was not required to have a license to collect her fee. We disagree.

In *Kingston Dev. Co. v. Kenerly*,[8] a broker brought an action against an investment corporation to recover his commission on the sale of a hotel. Instead of transferring its real property assets to the buyer, the defendant sold the buyer 100 percent of the stock of the corporation, which owned the hotel, and the broker was not paid his commission. The issue considered on appeal was:

> Can a property owner who contracts with a licensed broker to pay as commissions a stated percentage of the sales price of its land be relieved of that contractual liability for commissions through a change in the form of the transaction from the usual seller's deed of conveyance into an exchange of corporate stock between the parties?[9]

The Court found that it could not, as to do so would elevate form over substance. The Court stated, "[j]urisprudential pragmatism prevents the exaltation of legalities to a sacrosanct status in disregard of realities. . . . This practical approach leads us to rule that the contractual commissions commitment continues enforceable against [the investment company]."[10] Additionally, quoting a factually similar Massachusetts case, the Court stated that "[t]he sale of all of the stock of the corporation was in legal effect a sale of all of its assets, and the mere fact that the parties found it more convenient to transfer all of the stock rather than to make a conveyance of its assets does not

---

[6] Id. at 837-838 (2).

[7] (Citation and punctuation omitted; emphasis in original.) Id. at 838 (2).

[8] 132 Ga. App. 346 (208 SE2d 118) (1974).

[9] Id. at 350 (4).

[10] Id.

change the substance of the transaction."[11] We see no reason to deviate from this rule in this case. Thus, we must disagree with Everett that the sale of the stock removed this transaction from the ambits of the real estate code.

Regarding Everett's quantum meruit claim, it is clear from the evidence that although Goodloe acknowledged that he would pay Everett a bonus for her work in procuring Head as a buyer, there was never an agreement as to what amount she would receive. Everett deposed that Goodloe told her that she would be "amply rewarded." Goodloe testified that Everett's efforts to find a buyer were not considered to be a part of her regular employment duties. Ordinarily, in the presence of such facts, the reasonable value of extra work performed outside the scope of one's job duties could be recovered in quantum meruit.[12] However, "[a] court of justice will not lend its aid to the enforcement of any contract the making of which is prohibited."[13] Furthermore, "[a]n agreement prohibited by law cannot be the basis for a claim of quantum meruit."[14] Since, as discussed above, Everett was not authorized to assist in the procuring of a buyer of real estate in exchange for a fee, the trial court's grant of summary judgment to Goodloe on Everett's quantum meruit claim was appropriate.

2. Everett contends that the trial court erred by granting Goodloe summary judgment on her claims for assault and battery, invasion of privacy, and intentional infliction of emotional distress. The facts pertinent to these claims follow.

Everett deposed that the first assault occurred in early 1998, when Goodloe grabbed her breasts, pressed up against her, and smashed his face and teeth into her mouth, causing it to bleed. Everett thought that the assault occurred because Goodloe was angry that Everett treated him like a friend, as opposed to a boyfriend, while they were out with friends on January 31, 1998, but she was not certain that this particular event preceded the assault. When shown an e-mail message that she sent to Goodloe the next day in which she indicated that she had a "good time last night," Everett again stated that the attack followed the January dinner date and explained that she ignored most of Goodloe's conduct because she needed her job.

---

[11] (Citation and punctuation omitted.) Id. at 351 (4). Accord *Shortt v. Knob City Investment Co.*, 58 N.C. App. 123, 128 (292 SE2d 737) (1982) (sale of 100 percent of stock of corporation whose principal asset was real property constituted a sale of the property for the purpose of finding that the broker was entitled to his commission).

[12] See *Gerdes v. Russell Rowe Communications*, 232 Ga. App. 534, 537 (3) (502 SE2d 352) (1998).

[13] (Citation and punctuation omitted.) *Unifund Gen.*, supra at 838 (2).

[14] (Footnote omitted.) *O'Neal v. Home Town Bank of Villa Rica*, 237 Ga. App. 325, 329 (2) (514 SE2d 669) (1999).

Everett deposed that there were two assaults in May 1998, and that she began to fear Goodloe's anger, which typically followed her rejection of his sexual advances. She stated that the last incident occurred in September 1998 when Goodloe lunged at her and grabbed her legs. She deposed that she rejected him and that he fired her, only to rehire her the next morning.

In addition to Everett's deposition testimony, also considered on summary judgment were several other e-mail messages between Goodloe and Everett and excerpts from Everett's journal, which she called the "Morning Pages."[15] Everett deposed that the Morning Pages was not a diary per se, but simply notations of "whatever crept into my mind at the moment" and that she did not lie about events in the Morning Pages.

On April 6, 1998, Everett e-mailed Goodloe that he had offended her with his sarcasm about her work experience, that she expected him to treat her with the same courtesy and respect that she afforded him, and that she "did not see any room at all [in their relationship] for that sort of thing." On July 8 and 21, 1998, she signs other e-mail messages, "Love, Donna." On September 18, 1998, she writes in her journal,

> I've sought this situation — used my "power" to ingratiate myself to John so that I could survive. . . . Should I borrow the money from John today? Yes . . . I can use the money. . . . He comes out in those shorts like he did in that bathrobe-here I am looking gorgeous. . . . At least I've gotten rid of that sucking on my lip kiss. I hated it. Why do I want them totally under my spell? It's the only way I feel safe. . . . The weight is heavy as shown by this relationship with John. He even said now that this has happened again (he blames it on both [sic] our drinking) and maybe it is, I lose my inhibitions and he sees my distaste. . . . I release my emotional attachment to John.

In an e-mail to Goodloe dated November 23, 1998, Everett writes,

> Just a short note to tell you what's been on my mind. I'm not angry anymore, John. The day all the boxes of Rena's things were moved,[16] I thought about you and your life and her life

---

[15] Everett verified that the documents produced as exhibits were e-mail messages between her and Goodloe and pages from the Morning Pages.

[16] Rena was Goodloe's late wife.

and the anger just went away. . . . And to make a long story short . . . it just completed the whole healing process. I forgave you entirely for what I considered your wrongs toward me. . . . What all this means is that I am your friend, and I know you're mine. I miss your dear company and hope that you will be comfortable in renewing our friendship on a friendship basis. If you can do that, then you and Linda or whomever, and I and whomever (have been trying to go on some dates) can actually go to dinner and enjoy one another's company. But either way, the main thing I wanted you to know . . . is that I'm not angry at you anymore. . . . With love, Donna Jean.

Under *Prophecy Corp. v. Charles Rossignol, Inc.,*[17] a party/witness' testimony "is to be construed . . . against him when . . . self-contradictory."[18] On summary judgment, the trial judge decides whether the testimony is contradictory, and if so, whether the witness has offered a reasonable explanation for the contradiction.[19]

(a) "[A]n assault occurs when all the apparent circumstances, reasonably viewed, are such as to lead a person reasonably to apprehend a violent injury from the unlawful act of another."[20] "[T]he act of intentionally causing actual physical harm to another is civilly actionable as a battery. . . . It is the intent to make either harmful *or* insulting or provoking contact with another which renders one civilly liable for a battery."[21] The test as to whether an assault and battery has occurred " ' "is what would be offensive to an ordinary person not unduly sensitive as to his dignity." ' "[22]

In her brief, Everett explains that she did not mention the attacks in her e-mail messages or other writings because she feared losing her job. It does not appear, however, that Everett was so fearful of losing her job that she refrained from chastising Goodloe for other conduct that she felt was inappropriate. For example, she e-mailed him that she would not tolerate his insulting comments. Since

---

[17] 256 Ga. 27 (343 SE2d 680) (1986).

[18] (Citations and punctuation omitted.) Id. at 28 (1). Accord *Sawyer v. DeKalb Med. Center*, 234 Ga. App. 54, 57 (2) (506 SE2d 197) (1998).

[19] *Prophecy Corp.*, supra at 30 (2).

[20] (Citation and punctuation omitted.) *Bullock v. Jeon*, 226 Ga. App. 875, 878 (4) (487 SE2d 692) (1997).

[21] (Citations omitted.) *Hendricks v. Southern Bell Tel. &c. Co.*, 193 Ga. App. 264-265 (1) (387 SE2d 593) (1989).

[22] *Darnell v. Houston County Bd. of Ed.*, 234 Ga. App. 488, 490 (1) (506 SE2d 385) (1998), citing *Newsome v. Cooper-Wiss, Inc.*, 179 Ga. App. 670, 672 (347 SE2d 619) (1986), quoting Prosser, Law of Torts, § 9, p. 37 (4th ed. 1971).

Everett's deposition testimony about her contact with Goodloe contradicts her writings to Goodloe and in her journal, under *Prophecy*, we construe her testimony against her and affirm the grant of summary judgment to Goodloe on her claims for assault and battery.[23]

(b) Everett contends that the trial court erred by granting Goodloe summary judgment on her invasion of privacy claim.

> Under Georgia case law, the concept of invasion of privacy encompasses four loosely related but distinct torts, as follows: (1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye; and (4) appropriation for the defendant's advantage of the plaintiff's name and likeness.[24]

Everett's privacy claim is based upon Goodloe's alleged intrusion upon her seclusion. Everett specifically refers to the unwanted sexual touching and argues that questions regarding the extent of that touching should be resolved by a jury.

Like assault and battery, this tort is analyzed under an objective standard. The intrusion aspect of this type of invasion of privacy "involves a prying or intrusion, which would be offensive or objectionable to a reasonable person."[25] Everett relies heavily on *Troncalli v. Jones*[26] in support of her argument that the invasion of privacy claim should be resolved by a jury. However, in *Troncalli*, the evidence that the plaintiff suffered unwanted sexual touching at the behest of the defendant was clear, and the defendant's conduct was objectively unreasonable.[27] In this case, a personal relationship between the parties preceded and existed contemporaneously with the alleged improper conduct. In light thereof, and construing Everett's testimony against her under *Prophecy*, we must affirm the trial court's grant of summary judgment to Goodloe on this claim as well.

(c) Everett argues that the evidence that Goodloe exposed his sexual organ to her, forced her to touch him, lunged at her, grabbed

---

[23] See generally *Mangrum v. Republic Indus.*, 260 FSupp.2d 1229, 1255 (N.D. Ga. 2003) (plaintiff could not succeed on assault and battery claims where plaintiff testified that her employer's touching was not always objectionable and employer probably did not know when the conduct was objectionable and when it was not).

[24] (Citation omitted.) *Sun v. Langston*, 170 Ga. App. 60, 61 (2) (316 SE2d 172) (1984).

[25] (Citation omitted.) *Yarbray v. Southern Bell Tel. &c. Co.*, 261 Ga. 703, 705 (1) (409 SE2d 835) (1991).

[26] 237 Ga. App. 10 (514 SE2d 478) (1999).

[27] Id. at 14 (2).

her breasts, and sexually harassed her demanded the denial of Goodloe's motion for summary judgment on her claim for intentional infliction of emotional distress.

> The four elements which must be proved in order to sustain a claim of intentional infliction of emotional distress are: (1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; and (4) The emotional distress must be severe. . . . [I]t has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.[28]

Therefore, "[a]lleged tasteless and rude social conduct . . . is not actionable . . . [and] [t]here is no occasion for the law to intervene in every case where someone's feelings are hurt."[29] "Only where the distress inflicted is so severe that no reasonable person could be expected to endure it does the law intervene."[30] Whether a claim rises to a sufficient level of outrageousness or egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law for the court.[31]

Absent the continuing and complex relationship between these particular parties, we would not hesitate to find the alleged action quite sufficient to support a claim of intentional infliction of emotional distress. However, in the particular facts of this case and in light of the nature of Goodloe and Everett's relationship, we do not find error in the trial court's conclusion that Goodloe's conduct did not rise to the level of outrageousness required to support Everett's claim.

---

[28] (Citation omitted.) *Northside Hosp. v. Ruotanen*, 246 Ga. App. 433, 435 (541 SE2d 66) (2000).

[29] (Citation and punctuation omitted.) *Kornegay v. Mundy*, 190 Ga. App. 433, 434-435 (1) (379 SE2d 14) (1989).

[30] (Footnote omitted.) *O'Neal*, supra at 331 (6).

[31] *Clark v. Prison Health Svcs.*, 257 Ga. App. 787, 793 (3) (572 SE2d 342) (2002), citing *Northside Hosp.*, supra.

Everett also argues that her tort claims against the corporate defendants should not have been dismissed as they were liable under respondeat superior. As summary judgment in favor of Goodloe on her claims was proper, summary judgment in favor of the corporate defendants is likewise appropriate.

3. Everett was ordered to submit to an independent medical examination by a psychiatrist, Dr. Barbara Long. In her last enumeration of error, she contends that the trial court erred by admitting Dr. Long's report for consideration on summary judgment. In her brief, however, she argues that the error occurred when the trial court ordered the examination and relied on it in granting Goodloe's motion for summary judgment. We disagree.

Pursuant to OCGA § 9-11-35 (a), "[w]hen the mental . . . condition . . . of a party . . . is in controversy, the court . . . may order the party to submit to a . . . mental examination by a physician." The grant or denial of a motion requesting such an examination rests in the sound discretion of the trial court.[32] In her complaint, Everett repeatedly alleges that she suffered horrible emotional anguish, severe emotional injury, and great emotional harm, and asserts a claim for intentional infliction of emotional distress. Though Everett does not allege a continuing mental injury for which she is entitled to recover damages, as alleged in *Roberts v. Forte Hotels*,[33] she maintains that she suffered physical and mental injury. We have held that "[a] plaintiff in a negligence action who asserts mental or physical injury, places that mental or physical injury clearly in controversy and provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury."[34] We see no reason to apply a different rule where the action involves instead the alleged commission of intentional torts that resulted in physical and mental injury. As in negligence actions, the trial court should consider "the ability of the movant to obtain the desired information by other means . . . [and] the timeliness of the motion and the events leading up to it"[35] in the exercise of its discretion. In this case, Everett states in her interrogatory responses that she "did not seek specific medical treatment for the emotional injuries, bruises, and pain that defendant Goodloe intentionally caused her." Thus, there was no independent source from which evidence of Everett's emotional injuries could

---

[32] *Crider v. Sneider*, 243 Ga. 642, 644 (1) (256 SE2d 335) (1979).

[33] 227 Ga. App. 471, 474-475 (489 SE2d 540) (1997) (affirmed trial court's order requiring victim of assault to undergo a psychological evaluation where victim's allegation of continuing mental injury placed her mental condition in controversy).

[34] (Citations and punctuation omitted.) *Crider*, supra at 645 (1).

[35] (Citations omitted.) *Metro. Life Ins. Co. v. Lehmann*, 125 Ga. App. 539, 540 (188 SE2d 393) (1972).

be obtained. Therefore, we cannot find that the trial court abused its broad discretion by ordering the mental examination and considering the report upon summary judgment.[36]

*Judgment affirmed. Ruffin, P. J., concurs. Barnes, J., concurs in Divisions 1 and 3 and in the judgment. Blackburn, P. J., not participating.*

DECIDED JULY 15, 2004.

*Bondurant, Mixson & Elmore, H. Lamar Mixson, Lynn M. Adam, Lisa R. Strauss*, for appellant.

*Troutman Sanders, Richard W. Gerakitis, Rebecca L. Williams, Ashley Z. Hager*, for appellees.

---

[36] *Roberts*, supra at 474-475.