2007 UT App 169

**Ira SACHS, Plaintiff and Appellant,**

v.

**Joseph S. LESSER, Loeb Investors Co. XL, United Park City Mines Company, Capital Growth Partners, and John Does 1–10, Defendants and Appellees.**

No. 20060257–CA.

Court of Appeals of Utah.

May 17, 2007.

---

Kathryn Collard, Salt Lake City, for Appellant.

Laura S. Scott, Shane D. Hillman, Jason D. Boren, and Anthony C. Kaye, Salt Lake City, for Appellees.

Before BENCH, P.J., McHUGH and THORNE, JJ.

## OPINION

McHUGH, Judge:

¶ 1 Plaintiff Ira Sachs appeals the district court's order granting summary judgment to Defendants Joseph S. Lesser, Loeb Investors Co. XL, and United Park City Mines Company on Sachs's claims to recover a finder's fee. We affirm in part and reverse and remand in part.

## BACKGROUND [1]

¶ 2 This appeal arises from a dispute over Sachs's claim to a finder's fee for a transaction culminating in the purchase of all the outstanding stock of United Park City Mines (UPCM) by Capital Growth Partners, L.L.C. (Capital). At the time these events began in 1999, UPCM was a publicly held corporation involved in the leasing, development, and sale of real property located in and around Park City, Utah. Loeb Investors Co. XL (Loeb) was the controlling shareholder of UPCM, and Defendant Joseph S. Lesser served as both the Chairman of the Board of Directors of UPCM and President of Loeb. Hank Rothwell was the President of UPCM. Sachs was a shareholder in UPCM and worked as a business consultant in Park City.

¶ 3 In 1999, UPCM, acting under Rothwell's direction, entered into a letter of understanding with DMB Associates, Inc. (DMB), to form a joint venture to develop resort projects in Park City on a portion of UPCM's property.[2] The joint venture formed in June 2000. After attempts to agree on a business plan failed, the joint venture dissolved in January 2001, leaving UPCM obligated to pay DMB approximately $2.5 million in development costs and accrued interest.

¶ 4 Upon learning that the joint venture between UPCM and DMB had failed, Sachs contacted one of his clients, Granite Land Company (Granite), and introduced Granite to UPCM as a potential joint venturer to take the place of DMB in developing the resort projects. Around March 2001, Granite and UPCM signed a confidentiality agreement allowing them to exchange information related to a possible joint venture.

¶ 5 On May 2, 2001, Sachs traveled to New York to meet with Lesser, the chairman of UPCM's board of directors. At the meeting, Lesser expressed his displeasure regarding Rothwell's handling of the failed UPCM joint venture with DMB. Lesser indicated that he represented eighty-five percent of UPCM's shareholders, and that those shareholders had lost faith in Rothwell and did not want to invest any more money in UPCM. Lesser then asked Sachs to locate a joint venturer or purchaser for UPCM as quickly as possible, regardless of whether it was Granite, another party, or a combination. Although no specific amount of a finder's fee was discussed at the meeting, Lesser told Sachs that UPCM intended to engage Dresdner Kleinwort Wasserstein, Inc. (Dresdner) as a broker and that Sachs would not be entitled to a commission if Dresdner found a buyer for UPCM. During the conversation, Lesser did not mention or exclude any other persons or entities that could be approached as potential joint venturers or purchasers for UPCM aside from Dresdner and its contacts.

¶ 6 Following his meeting with Lesser, Sachs sent a letter to Rothwell on May 17, 2001, memorializing aspects of the New York

---

1. We note that many of the facts are hotly disputed. When "there is a factual dispute, we view the facts in the light most favorable to the nonmoving party," *Quaid v. U.S. Healthcare, Inc.,* 2007 UT 27, ¶ 8, 158 P.3d 525, in this instance, Sachs; and "[w]e recite the facts accordingly," *Sanders v. Leavitt,* 2001 UT 78, ¶ 1 n. 1, 37 P.3d 1052.

2. UPCM's only significant corporate asset is its real property holdings which include more than 8300 acres of land, of which approximately 5300 are leased to Deer Valley and Park City Mountain Resorts for skiing and related purposes.

meeting. The letter included a reference to Sachs's expectation of a finder's fee for his services in locating a joint venturer for UPCM. The letter stated:

> I am delighted that my introducing [UPCM] to Granite ... appears to be headed in the right direction and I am pleased that the confidentiality letter has been signed. I certainly will continue to do everything in my power to bring together a mutually satisfactory agreement between these two parties. I took the opportunity to express this commitment to your chairman, [Lesser], ... in early May.
>
> . . . .
>
> In that lunch with [Lesser], I was delighted to find that he seems to share our enthusiasm for this joint venture. I hope that this feeling is generally shared by the rest of your board. . . . [Lesser] gave me his encouragement to "get the job done."
>
> I write this letter to remind you that I will expect a modest finder's fee if an agreement comes to fruition. This could be cash, a couple of prime developed lots in the new project, or some other consideration acceptable to both of us. While I believe we have an understanding as to this finder's fee, I do think that matters of this sort ought to be out on the table early on, and I hope you feel the same.
>
> Please let me know if you have any questions concerning such finder's fee.

Later that same day, Rothwell transmitted the letter to Lesser. Lesser telephoned and informed Sachs that he did not want a joint venture partner for UPCM but was, instead, only interested in a purchaser.

¶ 7 The next day, Sachs followed up on this telephone conversation by sending a second letter to Rothwell clarifying Lesser's preference for a purchaser. The second letter stated:

> I understand, after a conversation yesterday with [Lesser], that his preference would be to sell the company rather than enter into a joint venture. . . .
>
> Happily, if your company's preference is sale, Granite, as I suggested in yesterday's letter is still an excellent prospect. Another investor, together with Granite, would make an excellent purchaser. I am happy to re-direct my focus to obtaining such a joint venture purchaser.
>
> Obviously, I will keep you apprised of all proposals, whether for sale or for a joint venturing of the project.

¶ 8 During this time, Sachs was also contacting several individuals regarding the purchase of UPCM. One of those people was Gerald Jackson, a real estate developer who had previously worked in Park City. During their initial conversation, Sachs conveyed to Jackson what he had learned from Lesser in New York, including Lesser's disappointment with Rothwell and Lesser's strong desire to sell UPCM instead of enter into a joint venture. Jackson thanked Sachs for the information and expressed interest in buying UPCM. Jackson told Sachs that he would like to "take [the UPCM] deal down with some institutional and other investors." Because Lesser had told Sachs that all interested parties should be referred to Rothwell, Sachs asked Jackson to contact Rothwell. Sachs also suggested that Jackson sign a confidentiality agreement so that Jackson could obtain information relevant to the purchase of UPCM and would be registered as one of Sachs's contacts. In addition, Sachs invited Jackson to contact Granite and offered to inquire whether Granite was interested in joining Jackson in a bid to purchase UPCM. During this initial conversation, Jackson never informed Sachs that he was already acquainted with Rothwell through prior business and social relationships or that he was already pursuing a purchase of UPCM directly with Rothwell. Rather, Jackson told Sachs that he would contact Rothwell and sign a confidentiality agreement.

¶ 9 Shortly thereafter, Sachs contacted Rothwell and informed him of Jackson's interest in putting together a group of investors to purchase UPCM. Sachs told Rothwell that Jackson became interested in purchasing UPCM upon learning from Sachs that Lesser was eager to sell. During this conversation, Rothwell never mentioned that he and Jackson were already engaged in negotiations concerning the sale of UPCM. As promised, Sachs also contacted Granite about

the possibility of affiliating with Jackson to purchase UPCM. And Jackson, acting on Sachs's suggestion, also contacted Granite.

¶ 10 On June 4, 2001, Sachs wrote to Jackson asking to be updated when Jackson contacted Rothwell or entered into a confidentiality agreement with UPCM. Jackson responded by telephoning and informing Sachs that he had already contacted Rothwell. On July 9, 2001, Jackson, acting through Aspen Ranch Corp., entered into a confidentiality agreement with Dresdner, who by that time was UPCM's investment banking firm. On July 31, 2001, Jackson helped form Capital, a Utah limited liability company, for the express purpose of purchasing UPCM.

¶ 11 From late July 2001, through the end of the year, Sachs frequently inquired about Jackson's progress in purchasing UPCM; however, Sachs was not personally involved in negotiating the deal. In late October 2001, Capital entered into a non-disclosure agreement with Dresdner to pursue a proposed acquisition of all the outstanding shares of UPCM. Four months later, Capital formally offered to purchase UPCM from its current shareholders. After reading a newspaper article about the offer, Sachs sent a facsimile to Rothwell which stated "completion of task."

¶ 12 About this time, in February 2002, Jackson telephoned Sachs and discussed Sachs's role in soliciting Jackson as a purchaser for UPCM. Jackson confirmed that Sachs was responsible for introducing Jackson to the deal and also stated that he had no problem with Sachs receiving a finder's fee on the transaction. Following this conversation with Jackson, Sachs began contacting Rothwell and Craig Terry, an attorney for UPCM, in an attempt to secure payment of a finder's fee for the transaction.

¶ 13 In June 2003, Capital purchased all the outstanding common stock of UPCM, by way of merger with its wholly owned subsidiary, CGP Acquisition, Inc. In the merger, UPCM, the surviving corporation, became a wholly owned subsidiary of Capital and retained all of its assets and liabilities, including its real estate assets. Following the completion of the transaction, Sachs continued to seek a finder's fee from UPCM. On August 11, 2003, Sachs again spoke with Jackson who expressed surprise that Dresdner received a finder's fee for the transaction instead of Sachs. Jackson reiterated that Sachs, and not Dresdner, had solicited him as a purchaser. Shortly after this exchange, Sachs faxed additional requests for payment to Rothwell at UPCM. Rothwell eventually returned a facsimile with a notation that stated: "Ira [Sachs]—[UPCM] does not agree with your agency argument. [Jackson] and I had discussed [UPCM] for years! We viewed you as a representative of Granite ... only!" [3]

¶ 14 In January 2004, Sachs brought suit against Lesser, Loeb, UPCM, and Capital in an effort to collect a finder's fee for the sale of UPCM to Capital. Among other things, Sachs alleged breach of an express oral contract or, in the alternative, recovery under theories of contract implied in fact and contract implied in law.[4] Lesser, Loeb, and UPCM (collectively Defendants) moved for summary judgment.[5] The trial court granted Defendants' motion, finding the undisputed facts did not support Sachs's claim for breach of an express finder's fee agreement because there was no meeting of the minds on the essential terms of the contract, including the amount of the fee. The trial court found that Sachs's claim for contract implied in fact similarly failed for a lack of definite-

---

**3.** In his deposition testimony, Lesser conceded that if Sachs had been responsible for introducing Jackson to UPCM, Sachs would have been entitled to a finder's fee.

**4.** Although the trial court refers to Sachs's contract implied in law claim as a claim for quantum meruit, we use the term "quantum meruit" to refer to both branches of that doctrine: 1) contract implied in fact; and 2) contract implied in law. See *Scheller v. Dixie Six Corp.*, 753 P.2d

971, 975 (Utah Ct.App.1988). We refer to the theories individually when only one is relevant to the discussion.

**5.** Capital was granted summary judgment on the ground that the undisputed facts could not support Sachs's claim for corporate successor liability. Sachs does not appeal this determination; we therefore limit our review to the claims against Defendants.

ness. Turning to Sachs's claim for contract implied in law, the trial court determined that Utah's statutes relating to the licensing of real estate brokers, *see* Utah Code Ann. §§ 61–2–1 to –27 (2006) (UREBA), and Utah's statute of frauds, *see* Utah Code Ann. §§ 25–5–1 to –9 (1998 & Supp.2006), barred Sachs's claim.[6] The trial court concluded that because Sachs was not a licensed real estate broker in Utah and there was no written memorandum of the parties' agreement, any claim for a finder's fee was barred by both UREBA and the statute of frauds as a matter of law. Sachs appealed.

## ISSUE AND STANDARD OF REVIEW

¶ 15 Sachs argues that the trial court erred in granting Defendants' motions for summary judgment. "Summary judgment is appropriate only where (1) 'there is no genuine issue as to any material fact' and (2) 'the moving party is entitled to a judgment as a matter of law.'" *Poteet v. White*, 2006 UT 63, ¶ 7, 147 P.3d 439 (quoting Utah R. Civ. P. 56(c)). Therefore, "[w]e review the district court's decision to grant summary judgment for correctness, granting no deference to the [district] court." *Swan Creek Vill. Homeowners Ass'n v. Warne*, 2006 UT 22, ¶ 16, 134 P.3d 1122 (second alteration in original) (quotations omitted).

## ANALYSIS

¶ 16 On appeal, Sachs alleges multiple points of error. First, Sachs argues that summary judgment was inappropriate because material issues of fact remain unresolved with respect to his claims for express oral contract and contract implied in fact. Next, Sachs contends that the trial court erred when it determined that UREBA applied to an acquisition of all of UPCM's outstanding stock thereby barring his express oral contract, contract implied in fact, and contract implied in law. Finally, Sachs asserts the trial court erred when it concluded that the statute of frauds barred his claims. We affirm in part and reverse and remand in part.

## I. Express Contract

¶ 17 Sachs argues that the trial court erred when it dismissed his express contract claim on the ground that no meeting of the minds occurred on the material terms of the contract. We affirm.

¶ 18 "A binding contract can exist only where there has been mutual assent by the parties manifesting their intention to be bound by its terms. Furthermore, a contract can be enforced . . . only if the obligations of the parties are set forth with sufficient definiteness that it can be performed." *Bunnell v. Bills*, 13 Utah 2d 83, 368 P.2d 597, 600 (1962) (footnote omitted), *overruled on other grounds by Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293 (Utah 1982); *see also Carter v. Sorenson*, 2004 UT 33, ¶ 7, 90 P.3d 637 ("A contract . . . must have definite terms . . . or else it cannot be enforced by a court."). "[W]here a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable." *Stangl v. Todd*, 554 P.2d 1316, 1319 (Utah 1976); *see also Utah Golf Ass'n v. City of N. Salt Lake*, 2003 UT 38, ¶ 13, 79 P.3d 919 ("An unenforceable agreement to agree occurs when parties to a contract fail to agree *on material terms* of the contract 'with sufficient definiteness to be enforced.'" (emphasis added) (quoting *Cottonwood Mall Co. v. Sine*, 767 P.2d 499, 502 (Utah 1988))).

¶ 19 Generally, material terms of a broker or finder's agreement include, but are not necessarily limited to: (1) a description of the performance required of the finder or broker, and (2) the amount of commission or fee to be paid for the completed performance. *See Case v. Ralph*, 56 Utah 243, 188 P. 640, 642 (1920) (recognizing that material terms of a finder or broker's agreement include "the terms and conditions of his employment, if any, and the amount of his commission, etc."); *C.J. Realty, Inc. v. Willey*, 758 P.2d 923, 928 (Utah Ct.App.1988) (outlining "critical terms of a finder's agreement" to include "the finder, the finder's clients, the

---

**6.** The trial court also determined that Sachs's claims for breach of express contract and recovery under contract implied in fact were similarly barred by UREBA and the statute of frauds.

property owner who will owe a commission to the finder if a transaction is closed with any of the finder's clients, and the commission rate").

¶ 20 Here, summary judgment was appropriate because the parties did not reach a meeting of the minds as to the amount of compensation due should Sachs succeed in finding a buyer for UPCM. *See Republic Group, Inc. v. Won–Door Corp.*, 883 P.2d 285, 290–91 (Utah Ct.App.1994) (recognizing, implicitly, that the amount of a finder's fee is an essential term of a finder's contract and determining that the parties agreement on a "reasonable" fee would be sufficiently definite to enforce where prior contract and future contract gave guidance as to what the parties considered reasonable). Although it is undisputed that Sachs sent a letter on May 17, 2001, indicating his willingness to accept "a modest finder's fee" in the form of "cash, a couple of prime developed lots in the new project, or some other consideration acceptable to both [parties,]" Sachs has failed to point to any facts that could support his contention that the parties actually agreed to the "modest" fee or to any other specific form or amount of compensation. Rather, it is undisputed that at the May 2, 2001 meeting, Sachs and Lesser did not discuss any specific amount of finder's fee. Additionally, Sachs admits that he did not have any specific compensation in mind when he drafted the letter and instead "was trying to draw [Rothwell] out to come up with something." It is also undisputed that, following the letter, the parties never agreed to the form or a specific amount of compensation. Therefore, Sachs's express contract claim fails as a matter of law because there was no meeting of the minds on the essential term of the fee to be paid.[7]

## II. Contract Implied in Fact

¶ 21 We now turn to the question of whether summary judgment was proper on Sachs's contract implied in fact claim. "Recovery under quantum meruit presupposes

that no enforceable contract exists," and can take either of two forms. *Scheller v. Dixie Six Corp.*, 753 P.2d 971, 975 (Utah Ct.App. 1988). The first is a claim for a contract implied in fact, which "is an actual contract established by conduct." *Id.* The second, is a claim for a contract implied in law or "quasi-contract," which is "not a contract at all, but rather an action in restitution." *Id.*

¶ 22 The trial court granted summary judgment on Sachs's contract implied in fact claim on the same ground it disposed of the express contract claim—that there was no meeting of the minds on the essential terms of a finder's fee agreement. Sachs argues that the trial court erred because it is not necessary, under a contract implied in fact theory, to prove a meeting of the minds on each essential term of a finder's fee agreement. We agree.

¶ 23 Like express contracts, contracts implied in fact "grow out of the intention of the contracting parties and in each case there must be a meeting of the minds before there can be a contract." *Morgan v. Board of State Lands*, 549 P.2d 695, 696 n.1 (Utah 1976) (plurality) (quotations omitted). However, unlike an express contract, recovery under a contract implied in fact does not necessarily require that the parties agree on the contract price. *See Davies v. Olson*, 746 P.2d 264, 267–69 (Utah Ct.App.1987) (allowing recovery under contract implied in fact where express contract claim was defeated for failure to show a meeting of the minds as to contract price). Instead, to prevail on a claim arising under a contract implied in fact, a plaintiff must show: "(1) the defendant requested the plaintiff to perform the work; (2) the plaintiff expected the defendant to compensate him or her for those services; and (3) the defendant knew or should have known that the plaintiff expected compensation." *Scheller*, 753 P.2d at 975; *accord Davies*, 746 P.2d at 269.

---

7. Sachs also argues that the May 17 letter was a written offer that Lesser accepted when he told Sachs to find a buyer, not a joint venturer. We disagree. "A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." Restatement (Second) Contracts § 26 (1981).

¶ 24 Generally speaking, "[t]he existence of an implied-in-fact contract is a factual question committed to the sound discretion of the jury." *Sanderson v. First Sec. Leasing Co.*, 844 P.2d 303, 306 (Utah 1992). However, on a review of summary judgment, the court "retains the power to decide whether, as a matter of law, a reasonable jury could find that an implied contract exists." *Id.; accord Knight v. Salt Lake County*, 2002 UT App 100, ¶ 6, 46 P.3d 247. Under this standard, summary judgment is appropriate only where "a reasonable jury cannot find that an implied contract exists." *Sanderson*, 844 P.2d at 306.

¶ 25 Here, there are disputed facts as to whether there was a contract implied in fact.[8] On two occasions, Lesser requested Sachs to find a buyer for UPCM.[9] The first time, at the meeting in New York and second when Lesser admonished Sachs that he wanted a buyer, not a joint venturer. Further, Sachs clearly expected to be compensated for his services and both UPCM and Loeb knew or should have known that. Sachs directly apprised UPCM of his expectation of a modest finder's fee when he sent the letter to Rothwell, the president of UPCM, on May 17, 2001. The letter, which specifically stated that "I[, Sachs,] will expect a modest finder's fee if an agreement comes to fruition," was transmitted to Lesser; so, it can be inferred that Lesser was also aware that Sachs expected a fee. When viewing these facts in a light most favorable to Sachs, as we must, *see Quaid v. U.S. Healthcare, Inc.*, 2007 UT 27, ¶ 8, 158 P.3d 525, we cannot say that no reasonable jury could find that an implied-in-fact contract exists. Thus, the issue should not have been "take[n] from the jury" where, as here, "there is ... evidence upon which a reasonable jury could infer" the truth of the claim. *Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d 1283, 1293 (Utah Ct.App.1996).

¶ 26 Defendants argue alternatively that we should affirm the trial court's summary judgment in favor of Defendants on Sachs's express and implied-in-fact contract claims because Sachs cannot prove that he was responsible for procuring Jackson as a buyer of UPCM. Because the role of a finder is much more limited than that of a broker, we disagree.

¶ 27 A "finder" is one who, for a fee, "find[s], introduce[s] and bring[s] together parties to a business opportunity, leaving ultimate negotiations and consummation of [the] business transaction to the principals." Black's Law Dictionary 437 (abridged 6th ed.1991); *see also Legros v. Tarr*, 44 Ohio St.3d 1, 540 N.E.2d 257, 263 (1989). A business finder, therefore, becomes entitled to his fee "if his introduction results in a transaction, irrespective of whether a third person brings the parties to agreement." *Legros*, 540 N.E.2d at 262; *see also Amerofina, Inc. v. U.S. Indus., Inc.*, 232 Pa.Super. 394, 335 A.2d 448, 452 (1975); *cf. Diversified Gen. Corp. v. White Barn Golf Course*, 584 P.2d 848, 850 (Utah 1978) (noting that depending on the terms of the agreement, a broker may "be required to effect a sale or *merely produce a customer*" (emphasis added)); *C.J. Realty, Inc. v. Willey*, 758 P.2d 923, 925 n. 1 (Utah Ct.App.1988) (holding recovery of commission possible where agreement required only that finder supply list of purchasers, one of whom buys property).[10]

8. Even if Sachs should prevail on his contract implied in fact claim, he may only recover "the amount the parties can be said to have reasonably intended as the contract price." *Scheller*, 753 P.2d at 975. If "the parties have left that amount unexpressed, courts will infer the amount to be the reasonable value of the plaintiff's services." *Id.* If the trial court reaches the question of reasonable value, it should consider, among other things, that Sachs testified that he spent no more than ten hours identifying Jackson as a buyer for UPCM.

9. We continue to state the facts in the light most favorable to Sachs, the non-moving party, *see Sanders*, 2001 UT 78 at ¶ 1 n. 1, 37 P.3d 1052, but note that there are disputed questions of fact as to whether Lesser was acting in his capacity as the Chairman of the Board of UPCM, President of Loeb, or both, or neither, when he requested that Sachs find a buyer for UPCM.

10. With a finder, "the causation, or 'procuring cause' requirement is satisfied by the mere introduction, even if negotiations are abandoned and later successfully resumed, provided the renewed negotiations are connected to and stem from the original introduction." *Legros v. Tarr*, 44 Ohio St.3d 1, 540 N.E.2d 257, 263 (1989); *see also Amerofina, Inc. v. U.S. Indus., Inc.*, 232 Pa.Su-

¶ 28 Conversely, a broker "not only introduces the parties but also negotiates on behalf of one of the parties with the best interests of one such party being his charge." *Legros*, 540 N.E.2d at 262. A broker becomes entitled to his commission if, through his direct and continuous actions, he produces a buyer or seller who is ready, willing, and able to complete the transaction on the principal's terms. *See Butterfield v. Consolidated Fuel Co.*, 42 Utah 499, 132 P. 559, 561 (1913) ("Before the broker can be said to have earned his commissions, he must produce a purchaser who is ready and willing to enter into a contract upon his employer's terms." (quotations omitted)); *see also Amerofina*, 335 A.2d at 453 ("In the brokerage case the broker must be the procuring cause of a ready, willing[,] and able buyer who purchases on the terms and at the price designated by the principal.").

¶ 29 Therefore, while both finders and brokers must demonstrate that they are the "procuring cause" of the transaction to recover their fee or commission, the term "procuring cause" has different meanings with respect to finders and brokers. These distinctions are important here because Sachs need only demonstrate that he introduced the parties who eventually consummated the transaction. *See Link–Hellmuth, Inc. v. Carey*, 101 Ohio App.3d 604, 656 N.E.2d 358, 362 (1995) (noting that "[i]t is possible for a finder to accomplish his service by making only two phone calls and, if the parties later conclude a deal, he is entitled to his commission"); *cf. Frederick May & Co. v. Dunn*, 13 Utah 2d 40, 368 P.2d 266, 269 (1962) ("The fact that the sale was consummated without participation by the [middleman] in the final negotiation does not preclude him from recovering his commission if the sale was otherwise procured by him.").

¶ 30 Sachs's deposition testimony places in dispute whether, as a finder, he was the procuring cause of the sale of UPCM to Capital. *See Nyman v. McDonald*, 966 P.2d 1210, 1213 (Utah Ct.App.1998) (" 'One sworn statement under oath [involving a material

fact] is all that is necessary to create a factual issue, thereby precluding summary judgment.' Such sworn statements include deposition testimony that is before the trial court on summary judgment." (alteration in original) (citation omitted)). Although it is undisputed that Jackson and Rothwell were acquainted, both professionally and socially, before the sale of UPCM to Capital, and that they both have testified that Rothwell introduced Jackson to the deal, Sachs has identified additional disputed facts that place Jackson's and Rothwell's testimonies into question. These facts, if believed, could support a finding that Sachs was the procuring cause of the transaction.

¶ 31 First, Sachs claims that he independently developed proprietary information through correspondence and dialogue with Rothwell and Lesser that UPCM was for sale, not merely seeking joint venture partners, and that Lesser was dissatisfied with Rothwell's management of UPCM. Sachs conveyed this information to Jackson who expressed an interest in purchasing UPCM. Sachs then urged Jackson to contact Rothwell at UPCM, sign a confidentiality agreement, and register as Sachs's contact. During their initial conversation, Jackson never informed Sachs that he was already pursuing the deal directly with Rothwell. Sachs's deposition testimony also outlines persistent correspondence, by telephone, fax, and letter, with Jackson from before execution of the confidentiality agreement until after completion of the merger.

¶ 32 Additionally, neither Jackson nor Rothwell have produced or recall any documentary evidence, predating Sachs's initial conversation with Jackson, that corroborates that Rothwell interested Jackson in the UPCM transaction. Jackson admits that he entered into the confidentiality agreement with UPCM and contacted Granite only after speaking with Sachs and that he knew, at some point, that Sachs expected a commission. Nevertheless, Jackson did nothing to inform Sachs that he was already working

per. 394, 335 A.2d 448, 453 (1975) ("[I]f a finder introduces a prospective buyer and seller who enter upon merger negotiations which are suspended and later resumed, the finder is still

entitled to a fee if the renewed negotiations ... directly result from the original introduction." (second alteration in original) (quotations omitted)).

with Rothwell. According to Sachs, Jackson even made statements that he believed Sachs would receive a commission, and that he had no problem with that. While we recognize that these disputed facts do not directly contradict Rothwell's and Jackson's deposition testimonies, when viewed as a whole and in a light most favorable to Sachs, they are sufficient to place into dispute the question of whether Sachs or Rothwell was responsible for procuring Jackson as a buyer.[11]

### III. Utah Real Estate Broker's Act

¶ 33 Defendants also argue that summary judgment on Sachs's express contract claims as well as his quantum meruit claims, for both contract implied in fact and contract implied in law, was proper for the independent reason that Utah's real estate broker's act (UREBA or the Act), *see* Utah Code Ann. §§ 61-2-1 to -27, bars Sachs from collecting a finder's fee as a matter of law. It is undisputed that Sachs was not licensed in Utah as a real estate broker at the time he claims to have solicited Jackson as a buyer for UPCM. Defendants contend that, because UPCM's only significant asset was its real property holdings and its primary activities were the development and marketing of that real property, the sale of 100% of UPCM's stock falls within UREBA's definition of real estate and bars Sachs from collecting a commission on the sale. This is an issue of first impression in Utah and has been treated variously by the courts that have considered it. Based on the language and history of the Utah statute, the long-held distinction between real and personal property, and the practical application of the Act, we hold that UREBA does not bar Sachs's claim.

¶ 34 UREBA includes both civil and criminal penalties for those acting as a principal real estate broker without a license. First, under the civil prong of UREBA,

> [n]o person may bring or maintain an action in any court of this state for the recovery of a commission, fee, or compensation *for any act done or service rendered which is prohibited under [UREBA]* to other than licensed principal brokers, unless the person was duly licensed as a principal broker at the time of the doing of the act or rendering the service.

Utah Code Ann. § 61-2-18 (2006) (emphasis added).

¶ 35 Second, the criminal prong of UREBA prohibits any person from "engag[ing] in the business, act[ing] in the capacity of, advertis[ing], or assum[ing] to act as a principal real estate broker ... within this state without a license." Utah Code Ann. § 61-2-1 (2006). A "[p]rincipal real estate broker" or "principal broker" is defined to include any person "who, with the expectation of receiving valuable consideration, assists or directs in the procurement of prospects for or the negotiation of," Utah Code Ann. § 61-2-2(12)(d), certain transactions involving "real estate," *id.* § 61-2-2(12)(a)(i).[12] When read together, these sections bar a person from maintaining a commission claim for procuring a buyer for real estate unless he was licensed at the time he engaged in the acts.[13] *See* Utah Code Ann. §§ 62-2-1(1), -2(12), -18(1); *Andalex Res., Inc. v. Myers*, 871 P.2d 1041, 1045 (Utah Ct.App.1994) (noting that UREBA provides that "(1) if a party brings an action in a Utah court, (2) for compensation, (3) for acts resulting in the sale or exchange of real estate, (4) he or she must have the

---

11. By so holding, we merely conclude that summary judgment was inappropriate. "We do not necessarily say that [Sachs's] claims have merit. They may not. However, in 'reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.'" *Francisconi v. Union Pacific R.R.*, 2001 UT App 350, ¶ 17 n. 4, 36 P.3d 999 (quoting *Tretheway v. Miracle Mortgage Inc.*, 2000 UT 12, ¶ 2, 995 P.2d 599).

12. The transactions include, but are not limited to, those in which any person "sells or lists for sale, buys, exchanges, or auctions *real estate,*

options on *real estate,* or improvements on *real estate* with the expectation of receiving valuable consideration." Utah Code Ann. § 61-2-2(12)(a)(i) (emphasis added).

13. Although the language of UREBA speaks in terms of real estate brokers, the statute's prohibitions apply with equal force to the activities of real estate finders. *See C.J. Realty, Inc. v. Willey,* 758 P.2d 923, 926 (Utah Ct.App.1988) (holding that Utah's real estate licensing statutes and statute of frauds apply equally to finders and brokers).

requisite broker license in order to recover the commission").

¶ 36 "Real estate" is defined by UREBA to "include[ ] leaseholds and *business opportunities involving real property.*" Utah Code Ann. § 61–2–2(14) (emphasis added). The phrase "business opportunities involving real property" is not, however, defined within the Act. Defendants argue that the sale of UPCM to Capital falls within this definition. In reaching this conclusion, Defendants assume that the proper inquiry is whether the ongoing business being conveyed engages in commercial activities involving real property. In contrast, Sachs argues that the sale of UPCM fell outside UREBA's definition of real estate because only stock was sold.

¶ 37 "When we interpret a statute, our 'primary goal ... is to give effect to the legislative intent, as evidenced by the plain language, in light of the purpose the statute was meant to achieve.'" *Utah State Tax Comm'n v. Stevenson,* 2006 UT 84, ¶ 32, 150 P.3d 521 (alteration in original) (quoting *State v. Holm,* 2006 UT 31, ¶ 16, 137 P.3d 726). We reach this goal by first looking "to the plain language of a statute to determine its meaning, and interpret its provisions in harmony with other statutes in the same chapter and related chapters." *Id.* (citation and quotations omitted). Only upon finding that the plain language is ambiguous do we proceed to "look to other interpretive tools." *Id.* (quotations omitted).

¶ 38 The plain language of section 61–2–2 of the Utah Code defines " 'Real Estate' [to] include[ ] leaseholds and business opportunities involving real property." Utah Code Ann. § 61–2–2(14). Neither the term "business opportunity" nor "business opportunity involving real property" is further defined in the chapter. Nevertheless, it is our task to give each word meaning, if possible. *See State v. Barrett,* 2005 UT 88, ¶ 29, 127 P.3d

682 ("We presume that the legislature used each word advisedly· and give effect to each term according to its ordinary and accepted meaning." (quotations omitted)). Defendants contend that the proper inquiry is whether the ongoing *business* engages in commercial activities involving real property. Had the legislature defined real estate to include businesses involving real property, we would agree that UREBA is applicable. The plain language of the statute, however, includes only business opportunities. *See* Utah Code Ann. § 61–2–2(14). And Defendants' interpretation would render the word "opportunities" meaningless, something we must avoid when possible.[14] When we consider the plain language of the Act in its entirety, however, it is unclear from that language alone whether Sachs was required to comply with UREBA when finding a buyer for all of UPCM's stock.

¶ 39 Although the plain language of the Act is ambiguous, we nevertheless find Defendants' interpretation conflicts with the legislature's intent as evidenced by the history of section 61–2–2.[15] *See* Utah Code Ann. § 61–2–2. Prior to 1985, the term "business opportunity" was defined in UREBA to "mean[ ] an existing business, a business and its good will, a business franchise, or any combination of them." Utah Code Ann. § 61–2–2(5) (Supp.1983) (amended 1985). However, in 1985, the Utah Legislature deleted this definition from the chapter. *See* Real Estate Amendments, ch. 162, § 2, 1985 Utah Laws 308, 309. We assume, therefore, that the legislature intended to redefine the phrase "business opportunities" to no longer mean existing businesses, businesses and their good will, or business franchises. *See Sindt v. Retirement Bd.,* 2007 UT 16, ¶ 13, 570 Utah Adv. Rep. 71 ("We may not ignore the legislature's decision to remove the term."). Indeed, the omission of this language "logically can mean nothing but that

---

**14.** "Determining the legislature's intent requires that 'we seek to render all parts [of the statute] relevant and meaningful, and we accordingly avoid interpretations that will render portions of a statute superfluous or inoperative.'" *Carter v. University of Utah Med. Ctr.,* 2006 UT 78, ¶ 9, 150 P.3d 467 (alteration in original) (quoting *Hall v. Department of Corr.,* 2001 UT 34, ¶ 15, 24 P.3d 958).

**15.** Upon finding that the plain language of a statute is ambiguous, we are free to "look to other interpretive tools." *Utah State Tax Comm'n v. Stevenson,* 2006 UT 84, ¶ 32, 150 P.3d 521 (quotations omitted).

the legislature's purpose deliberately was to remove" those terms from the definition. *Id.* Thus, prior to 1985 it may have been proper, as Defendants urge, to substitute the terms "existing business" for the phrase "business opportunities" in the definition of real estate and then to inquire whether the existing business's activities involved real property. However, since the 1985 amendments, this inquiry is no longer appropriate. Instead, the proper inquiry is to examine the specific character of the business opportunity and to determine whether that opportunity involved real property.

¶ 40 Here, the business opportunity at issue is the purchase of all of UPCM's capital stock. UPCM, as the surviving entity in the merger between UPCM and CGP Acquisitions, Inc., retained its corporate structure and all of its assets and liabilities, including its real property. Thus, no real estate changed hands as a result of the transaction. Stock or shares in a corporation are generally considered personal property[16] and represent only "[t]he shareholders' essential right to share in the profits and in the distribution of assets on liquidation in proportion to their interest in the enterprise." James D. Cox, Thomas Lee Hazen, & F. Hodge O'Neal, 1 Corporations § 7.2 (2002). This interest "is in no sense an individual right in specific property" of the corporation; instead, "[s]hareholders are in the position of claimants against the corporation with an expectation of sharing in the profits and a right to distribution of residual assets upon winding up." *Id.; cf. MacKay v. Hardy,* 896 P.2d 626, 629 n. 4 (Utah 1995) (describing shareholder's interest in corporate assets as only an equitable interest).

¶ 41 Because a corporation exists as a distinct legal entity, when the corporation acquires property, the title vests in it as a separate entity distinct from its shareholders. Utah has long recognized that "[a] corporate entity [is] separate and apart from its stockholders" even where a single or small group of stockholders own a controlling interest in the corporation.[17] *National Am. Life Ins. Co. v. Bainum,* 28 Utah 2d 45, 497 P.2d 854, 855–56 (1972); *see also Transamerica Cash Reserve, Inc. v. Dixie Power & Water, Inc.,* 789 P.2d 24, 26 (Utah 1990) (discussing legal separation of shareholder and corporation); 12B Fletcher Cyclopedia of the Law of Private Corporations § 5771 (perm. ed. 2000) ("The owner of a majority, or all or nearly all of the stock of a corporation, whether an individual, a collection of individuals, or another corporation, does not own the property of the corporation."). Likewise, "[w]hen a stockholder sells his stock, he is selling his proprietary interest in a going concern and not an interest in the corporate assets." [18] *Owens v. Commissioner,* 568 F.2d 1233, 1239 (6th Cir.1977); *cf.* Utah Code Ann. § 16–10a–102(33) (2005) (defining "shares" in a corporation to "mean[ ] the units into which the proprietary interests in a corporation are divided").

¶ 42 Applying the foregoing principles, we hold that Capital gained only a "proprietary interest in a going concern and not an interest in [UPCM's real property] assets." *Owens,* 568 F.2d at 1239. UPCM continued to own, possess, and control the real property throughout and following the merger transaction. *See, e.g.,* Utah Code

16. An exception to the general rule arises with respect to stock in a mutual irrigation corporation, which has been held to represent an interest in real property. *See Salt Lake City Corp. v. Cahoon,* 879 P.2d 248, 252 (Utah 1994).

17. UPCM was a public corporation and its shares were traded on the New York Stock Exchange.

18. The distinctions between corporate stock and asset purchases are well recognized. Generally speaking, when all the assets of an ongoing business are purchased, "the purchaser does not acquire the liabilities of the corporation as a stock purchaser would." *Bertha v. Remy Int'l,* *Inc.,* 414 F.Supp.2d 869, 877 (E.D.Wis.2006); *see also Decius v. Action Collection Serv., Inc.,* 2004 UT App 484, ¶ 8, 105 P.3d 956. Additionally, the purchaser in an asset transaction takes legal title to the property, i.e., "title to property transfers from one party to another[. Conversely,] in a stock purchase transaction the corporation's assets remain titled in the corporation's name." *Bertha,* 414 F.Supp.2d at 877. Because the sale of UPCM to Capital was accomplished exclusively through the sale of stock and involved no corporate assets, we do not address the applicability of Utah's real estate licensing provisions to a business opportunity accomplished through an asset transfer.

Ann. § 16–10A–1106(b) (2005) ("The title to all real estate and other property owned by each corporation party to the merger is transferred to and vested in the surviving corporation without reversion or impairment."). Thus, even though UPCM, as an ongoing business, exists for the sole purpose of owning and dealing in real estate, Sachs did not find a participant in a business *opportunity* involving real property because

> [s]hares of stock, which represent the holder's partial but undivided ownership of the corporation, constitute a property interest quite distinct from the capital or tangible assets of the corporation.... The fact that the entire capital may be invested in real estate does not change the character of the shares of the corporation as personal property.

Richard A. Lord, 17 Williston on Contracts § 51:2 (4th ed.2006) (footnotes omitted); *see, e.g., Evans v. Prufrock Rests., Inc.*, 757 S.W.2d 804, 805–06 (Tex.Ct.App.1988) (noting that when there is "no assignment of [corporate] assets, but instead ... a sale of capital stock" that the transaction is for ·a sale of personalty, not realty).

¶ 43 In reaching this result, we join those jurisdictions that recognize a distinction between the sale of assets and the sale of stock for purposes of applying statutes regulating the activities of real estate brokers. *See Gruber v. Owens–Illinois, Inc.*, 899 F.2d 1366, 1368–75 (3d Cir.1990) (interpreting

Pennsylvania law and finding that sale of stock would be exempted from real estate licensing requirements), *cited with approval by Winthrop & Co. v. Milgrom*, 447 Pa.Super. 140, 668 A.2d 557, 560–61 (1995).[19] In *Gruber*, the Third Circuit reasoned that "commercial transactions" characterized by the purchase of shares in an existing corporation through stock acquisitions "would be distorted if the corporate form of sale were ignored, particularly when it is recognized that the title and ownership of whatever real estate may be involved in the sale remains within the corporate body, under the corporate name, and never changes hands." [20] *Id.* at 1374. We agree that this long recognized principle should not be ignored lightly, nor without clear direction from the Utah Legislature.

¶ 44 We acknowledge that some jurisdictions have interpreted similar acts of their legislatures as including the sale of a business through a stock transfer. *See, e.g., Cooney v. Ritter Trans., Inc.*, 939 F.2d 81, 84–88 (3d Cir.1991) (finding New Jersey licensing act applicable to sale of stock); *Shochet Secur., Inc. v. First Union Corp.*, 663 F.Supp. 1035, 1037 (S.D.Fla.1987) (finding sale of stock within Florida's licensing provisions); *All Points Traders, Inc. v. Barrington Assoc.*, 211 Cal.App.3d 723, 259 Cal.Rptr. 780, 786 (1989) (holding that real estate broker's license is required when negotiating the sale of 100% of corporate stock); *Lieff v.*

---

**19.** See also, e.g., *Abramson v. Gulf Coast Jewelry & Specialty Co.*, 445 F.2d 802, 803 (5th Cir.1971) (per curiam) (finding that sale of stock fell outside Alabama's real estate licensing requirements); *Bertha*, 414 F.Supp.2d at 877–81 (finding Wisconsin's real estate licensing provisions inapplicable to sale of corporate stock); *Cambridge Co. v. Arizona Lawn Sprinklers, Inc.*, 166 Ariz. 269, 801 P.2d 504, 506 (Ct.App.1990) (noting that "if a purchaser had acquired [the business's] corporate stock or if the transaction had involved a merger or consolidation, [the broker] could have legally participated in the transaction without holding a real estate license"); *Frier v. Terry*, 230 Ark. 302, 323 S.W.2d 415, 419 (1959) ("[T]he mere fact the corporation or corporations own buildings situated on realty did not necessitate the holding by [the broker] of a real estate license in order to claim a commission on the sale of corporate stock."); *Turnpike Motors, Inc. v. Newbury Group, Inc.*, 403 Mass. 291, 528 N.E.2d 1176, 1177 (1988) ("We accept that the sellers would have owed the full commission ...

if corporate stock (and not assets) had been sold."); *Moody v. Hurricane Creek Lumber Co.*, 290 Or. 729, 625 P.2d 1306, 1310–11 (1981) (holding that sale of stock of ongoing corporation was not calculated to result in the sale of real estate, and therefore fell outside real estate licensing requirements); *Evans v. Prufrock Rests., Inc.*, 757 S.W.2d 804, 805–06 (Tex.Ct.App.1988) (same).

**20.** Defendants argue that *Gruber v. Owens–Illinois, Inc.*, 899 F.2d 1366 (3d Cir.1990), represents a distinct minority position. However, careful reading of the cases that have expressly considered the distinction between stock and asset purchases suggests that the courts are more evenly divided. Regardless of which position boasts the higher number of decisions, for the reasons stated in this opinion, we conclude that the Utah Legislature did not intend UREBA to apply to the sale of corporate stock.

*Medco Prof. Servs. Corp.*, 973 P.2d 1276, 1278 (Colo.Ct.App.1998) (same); *Everett v. Goodloe*, 268 Ga.App. 536, 602 S.E.2d 284, 289 (2004) (same); *Shortt v. Knob City Inv. Co.*, 58 N.C.App. 123, 292 S.E.2d 737, 740 (1982) (same); *Schmitt v. Coad*, 24 Wash. App. 661, 604 P.2d 507, 510 (1979) (same). In some instances, there are statutory differences that support a contrary approach.[21]

¶ 45 For example, California has held that a stock transfer is subject to its real estate broker licensing requirements. *See All Points Traders*, 259 Cal.Rptr. at 786 (holding that real estate broker's license is required when negotiating the sale of 100% of a corporation's stock). Historically, California had separate licensing requirements for business opportunity transactions and real estate transactions. *See id.* at 782. However, due to confusion "as to whether a business opportunity broker's license, a real estate license, or both were required, when a business opportunity transaction involved real estate," in 1965, the California Legislature "merged the real estate and business opportunity licenses under the supervision of [California's] Department of Real Estate." *Id.* From its inception the business opportunities licensing requirements did not exempt incorporated businesses.[22] *See id.* Therefore, after the merger of the licensing requirements, California courts continued to apply the real estate licensing requirements to the sale of businesses involving the transfer of stock whether or not those opportunities involved real property. *See id.* The legislative trends noted in California, however, are inapposite to those experienced in Utah.

¶ 46 In 1921, Utah enacted its first statute regulating real estate brokers and real estate salespeople. *See An Act to Define Real Estate Brokers and Real Estate Salesmen*, ch. 110, §§ 1–16, 1921 Utah Laws 304, 304–09. At that time, the enforcement of the act was entrusted to the state securities commission. *See id.* § 4. The legislature amended the Act in 1939 to incorporate a definition for "real estate" that included "leaseholds and other interests not less than leaseholds" within the reach of the Act. Act of March 7, 1939, ch. 106, § 1, 1939 Utah Laws 140, 140. In 1963, the legislature again expanded the scope of the Act by amending the definition of real estate to include "leaseholds and business opportunities." *An Act Relating to Real Estate Brokers*, ch. 146, § 1, 1963 Utah Laws 521, 522. Simultaneously, "business opportunities" was defined to "include an existing business, business and the good will attached thereto or any one or a combination thereof." *Id.* At this point, Utah, like California, merged the licensing requirements for both business opportunity brokers and real estate brokers under the supervision of the securities commission.

¶ 47 The legislature enacted the Utah Uniform Securities Act (UUSA) in 1963, which provided for the registration of broker-dealers, agents, investment advisors, and securities. *See Uniform Securities Act*, ch. 145, § 1, 1963 Utah Laws 494, 494–521. Initially, enforcement of both the real estate broker's licensing act and the UUSA was the responsibility of the state securities commission. In 1983, the scope of the real estate licensing provisions was extended, by amending the definition of real estate to "include[ ] leaseholds, business opportunities, and all time-share interests (including but not limited to fee simple, club membership, limited partnership, and beneficiary interest in a time share trust)." *Division of Real Estate Amendments–Sunset Review*, ch. 257, § 1, 1983 Utah Laws 1020, 1021. But, at that same time the Utah Legislature formed the Division of Real Estate within the Department of Business Regulation, effectively removing

---

21. The Colorado definition of real estate broker extends to transactions involving a business, a business opportunity, or *any* interest therein. *See* Colo.Rev.Stat. Ann. § 12–61–101(2)(i) (West 2006) (emphasis added). In contrast, the Utah Legislature deleted the reference to an interest in an "existing business" from the definition of business opportunity in UREBA in 1985. *See* Real Estate Amendments, ch. 162, § 2, 1985 Utah Laws 308, 309.

22. California's real estate licensing statute is also broader than UREBA because it applies to all business opportunities, while Utah's applies only to business opportunities involving real property. *Compare* Cal. Bus. & Prof.Code. § 10131(a) (Deering 2007), *with* Utah Code Ann. § 61–2–2(14).

real estate broker licensing and enforcement from the securities commission. *See id.* § 5.

¶ 48 This reorganization split real estate licensing and enforcement from securities enforcement. Shortly thereafter, the legislature began collapsing the definition of real estate within the real estate licensing statute. In 1985, the Utah Legislature contracted the scope of the real estate broker's act in two ways. First, it narrowed the definition of real estate by including the limiting phrase "involving real property." *See* Real Estate Amendments, ch. 162, § 2, 1985 Utah Laws 308, 309 (amending definition of real estate to include "leaseholds, business opportunities, and all timeshare interests . . . *involving real property* " (emphasis added)). Second, it deleted "existing business, business and the good will attached thereto or any one of a combination thereof" from the expansive definition of "business opportunity." *Id.* When taken together, these changes signal the Utah Legislature's intent, unlike California, to narrow the scope of the real estate licensing statute and to recognize securities transactions as a distinct regulatory subject.[23]

¶ 49 Furthermore, the purposes of UREBA are not advanced by requiring a Utah real estate broker's license for finding a buyer for 100% of the common stock of a publicly traded company. UREBA was adopted "for the protection of members of the public who rely on licensed real estate brokers and salespeople to perform tasks that require a high degree of honesty and integrity." *Global Recreation, Inc. v. Cedar Hills Dev. Co.,* 614 P.2d 155, 158 (Utah 1980) (finding that the purpose of UREBA is "not to protect real estate developers who seek relief from their own contractual obligations"). Further, this is not a case like *Andalex Resources, Inc. v. Myers,* 871 P.2d 1041 (Utah Ct.App. 1994), where we held that the purpose of the Act cannot override its express statutory terms to exempt from regulation a transaction unambiguously covered by the Act. *See id.* at 1045 & n. 6. As discussed previously, the language of UREBA is ambiguous and we may, therefore, look to "the purpose the statute was meant to achieve" in interpreting its language. *See Utah State Tax Comm'n v. Stevenson,* 2006 UT 84, ¶ 32, 150 P.3d 521. Thus, interpreting UREBA to have limited application is consistent with the purpose of the Act because it is highly unlikely that unsophisticated members of the public will be party to a merger which results in one corporation purchasing 100% of the common stock of another.

¶ 50 We also reject Defendants' argument that our decision today elevates form over substance. Essentially, Defendants contend that the

> sale of all the stock of [a] corporation [is] in legal effect a sale of all of its assets, and the mere fact that the parties found it more convenient to transfer all of the stock rather than to make a conveyance of its assets does not change the substance of the transaction.

*Everett v. Goodloe,* 268 Ga.App. 536, 602 S.E.2d 284, 289 (2004) (quoting *Kingston Dev. Co. v. Kenerly,* 132 Ga.App. 346, 208 S.E.2d 118 (1974)). We cannot agree that

---

23. The intent to distinguish securities transactions from real estate transactions is also apparent in the legislature's creation of exemptions that effectively abolish the need for dual licensing in transactions in which real estate is a necessary element of a security. *See* Utah Code Ann. § 61–2–3(3) (2006) (exempting licensed securities brokers from the real estate licensing requirements where the real estate in the transaction "is a necessary element of a 'security' "); *cf. id.* § 61–1–13(1)(c)(ii)(G) (2006) (exempting licensed real estate brokers from the licensing requirements of the Utah Uniform Securities Act when the transaction is for a "bond or other evidence of indebtedness secured by a . . . mortgage or deed of trust, or by an agreement for the sale of real estate").

Although it is unclear whether Sachs is a licensed securities broker, Defendants did not seek summary judgment on that ground. Thus, resolution of whether Sachs's claims are impacted by the application of federal or state securities laws is beyond the scope of this decision. *See Payable Accounting Corp. v. McKinley,* 667 P.2d 15, 18 (Utah 1983) (discussing securities transactions falling within scope of Federal and Utah securities laws); *cf. Bertha,* 414 F.Supp.2d at 877 (noting that legislative history suggests that stock sales are not covered by Wisconsin's real estate licensing statutes because they are "specifically governed by securities laws"); *Sergeant v. Leonard,* 312 N.W.2d 541, 547–48 (Iowa 1981) (recognizing applicability of Iowa's blue sky laws to transfer of business through sale of its common stock).

the sale of the stock of a corporation is legally equivalent to a sale of its assets. Nor do we believe that the distinction between the two types of transactions elevates form over substance.

¶ 51 Utah has long recognized the importance of the separate legal identity of corporations and has been unwilling to permit parties to ignore those distinctions. *See Utah State Rd. Comm'n v. Steele Ranch,* 533 P.2d 888, 891 (Utah 1975) ("[W]here persons organize[ ] a corporation to acquire the advantages flowing from its existence as a separate entity, they should not be able to disregard the corporate entity to gain an advantage for another purpose."). Here, Capital chose to structure its acquisition of UPCM as a stock rather than an asset purchase. " '[T]he difference in a buyer's assumption of liabilities when entering into a stock purchase agreement versus an asset purchase agreement is well-known in the business community.' " *Bertha v. Remy Int'l, Inc.,* 414 F.Supp.2d 869, 881 (E.D.Wis. 2006) (quoting *Columbia Propane,* 2003 WI 38, ¶ 29, 261 Wis.2d 70, 661 N.W.2d 776). Defendants should not be permitted to enjoy the benefits of UPCM's separate corporate structure for some purposes while also claiming it elevates form over substance in an attempt to defeat Sachs's claim for a finder's fee. *See Steele Ranch,* 533 P.2d at 891.[24]

### IV. Statute of Frauds

¶ 52 As a separate ground for summary judgment, Defendants argue that Sachs's claim to a finder's fee is unenforceable under the Utah Statute of Frauds because there is no written memorandum of the alleged agreement. Defendants rely on Utah Code section 25–5–4, which provides that "every agreement authorizing or employing an agent or broker to purchase or sell real estate for compensation," is "void unless the agreement, or some note or memorandum of the agreement, is in writing, signed by the party to be charged with the agreement[.]" Utah Code Ann. § 25–5–4(1)(e). Defendants argue that the definition of "real estate" in UREBA, which includes business opportunities involving real property, *see* Utah Code Ann. § 61–2–2(14), is equally applicable to Utah's statute of frauds. Assuming, without deciding, that the statute of frauds utilizes the same definition of "real estate" as UREBA, Sachs's alleged finder's fee agreement falls outside the reach of that statute for the same reasons that UREBA is inapplicable. Specifically, section 25–5–4 of Utah's statute of frauds does not apply to brokerage agreements for the sale of exclusively personal property. And, as discussed in more detail above, the stock in a corporation is personalty, not realty. *See Evans v. Prufrock Rests., Inc.,* 757 S.W.2d 804, 805–06 (Tex.Ct.App. 1988). This is true even where, as here, the corporation's only significant asset is its real property because ownership of stock is not the equivalent of an ownership interest in the corporation's assets. *See Klein v. Board of Tax Supervisors,* 282 U.S. 19, 24, 51 S.Ct. 15, 75 L.Ed. 140 (1930). Therefore, agreements to broker corporate stock for compensation do not fall within the scope of section 25–5–4(1)(e).[25]

---

24. Defendants' position also raises additional questions, including the amount of real property that must be owned by the subject corporation and the number of shares that must be transferred before the licensing requirements of UREBA would be triggered. For example, would the sale of a single share of UPCM stock over the New York Stock Exchange require a Utah real estate license? *See, e.g., Cooney v. Ritter Transp., Inc.,* 939 F.2d 81, 88 (3d Cir.1991) (allowing an unlicensed finder of a buyer for corporate stock to recover a commission "on so much of the purchase price as is attributable to the personalty" of the target corporation); *Thomas v. Daubs,* 291 Ill.App.3d 682, 226 Ill.Dec. 15, 684 N.E.2d 1011, 1015 (1997) (allowing an unlicensed finder of a buyer for corporate stock to recover a com-

mission "when real estate is only incidental to the entire transaction"); *March Group, Inc. v. Bellar,* 908 S.W.2d 956, 958–60 (Tenn.Ct.App. 1995) (addressing whether stock transaction conveying a "controlling interest" in a corporation with 43% of its assets in real property triggered real estate licensing requirements and recognizing a presumption that a stock purchase is incidental unless real estate is the principal corporate asset).

25. Indeed, Utah Code section 70A–8–112 specifically bars the application of Utah's statute of frauds to contracts for the sale or purchase of securities. *See* Utah Code Ann. § 70A–8–112 (2002).

¶ 53 This interpretation is consistent with this court's decision in *Mackintosh v. Hampshire*, 832 P.2d 1298 (Utah Ct.App.1992). In that case, the plaintiff sued to enforce an oral contract for services in exchange for a 10% interest in the profits of a partnership's real estate developments. *See id.* at 1299. The partnership argued that the agreement was barred by the statute of frauds. We disagreed, reasoning that the plaintiff was claiming an interest only in the profits of the real estate project. *See id.* at 1301. Thus, the claim was not for an interest in the real property itself and therefore did not fall within the statute of frauds. *See id.* at 1302. Similarly, the purchase of the shares of UPCM gave Capital an interest in only the profits and losses of the corporation and did not represent any legal interest in its real property assets. Thus, the statute of frauds does not bar Sachs's claim to a finder's fee.

## CONCLUSION

¶ 54 Under Utah law, an express contract for a finder's fee is not enforceable where the parties have not had a meeting of the minds on the essential term of the commission or fee to be paid, and summary judgment was properly granted on Sachs's claim for an express finder's fee agreement. However, summary judgment was improperly granted with respect to Sachs's claim for contract implied in fact because the disputed facts could support the conclusion that Defendants requested performance, Sachs expected to be compensated, and Defendants knew or should have known that Sachs expected to be paid. Additionally, Sachs's claims for contract implied in fact and contract implied in law are not barred by UREBA because the Act does not require a real estate license to engage in transactions dealing exclusively in corporate stock. Likewise, section 25–5–4(1)(e) of Utah's statute of frauds does not apply to transactions dealing with personal, as opposed to real property.

¶ 55 Accordingly, we affirm in part and reverse and remand in part.

¶ 56   I   CONCUR:   WILLIAM   A. THORNE JR., Judge.

¶ 57   I   CONCUR   IN   THE   RESULT: RUSSELL W. BENCH, Presiding Judge.